UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Aviva Sports, Inc.,

       Plaintiff,

v.                                                          Civil No. 09-1091 (JNE/JSM)
                                                            ORDER
Fingerhut Direct Marketing, Inc., Menard, Inc.,
Kmart Corporation, Wal-Mart Stores, Inc., and
Manley Toys, Ltd.,

       Defendants.

      Plaintiff Aviva Sports, Inc. (Aviva) brought this action against Defendants Fingerhut

Direct Marketing, Inc. (Fingerhut), Menard, Inc. (Menard), Kmart Corporation (Kmart), Wal-

Mart Stores, Inc. (Wal-Mart), and Manley Toys, Ltd. (Manley), alleging patent infringement and

false advertising in violation of the Federal Lanham Act, 15 U.S.C. § 1125(a) (2006),  and the

Minnesota Uniform Deceptive Trade Practices Act (UDTPA), Minn. Stat. § 325D.44 (2010).  In

an Order dated June 27, 2011, this Court granted Wal-Mart's Motion for Partial Summary

Judgment as to the Lanham Act claim (Count III of the Amended Complaint).  On September 23,

2011, this Court granted summary judgment in favor of Fingerhut, Menard, and Kmart as to the

Lanham Act claim (Count III of the Amended Complaint) and the Minnesota UDTPA claim

(Count IV of the Amended Complaint).  On October 6, 2011, based on the stipulation of the

parties, this Court granted summary judgment in favor of Wal-Mart as to the Minnesota UDTPA

claim (Count IV of the Amended Complaint).  Now before the Court are Manley's Motion for

Summary Judgment, Manley's Motions to Exclude Expert Testimony, and Aviva's Motion to

Exclude Expert Testimony.[1]

---

[1] Fingerhut, Menard, Kmart, and Wal-Mart join in Manley's Motion for Summary Judgment and Motions to
Exclude Expert Testimony.  This Order therefore applies to these retailer defendants as well.

# I.      BACKGROUND[2]

Aviva manufactures and sells, among other things, inflatable water slides and pools.  In 2001, Aviva Sports, L.L.C. began selling inflatable slides for children to use in swimming pools.  It expanded its product line so that by 2006, it had twelve fixed-air[3] inflatable slides and pools, generating sales of $1.69 million.  Manley began selling inflatable water slides and pools in or around 2003.[4]  Manley sells both fixed-air and constant-air products.  Both Manley's and Aviva's products were available in retail stores, such as Menard, Fingerhut, and K-Mart, as well as through the Internet.  In 2006, the retailer Target began carrying Manley's products along with Aviva's products.

In 2007, Aviva created a prototype of a constant-air slide, which it presented at Target's competitive line review.  According to Aviva, it was told not to pursue this product because Manley already "owns" the market for constant-air slides.  Sometime thereafter, Aviva ceased its efforts to market its constant-air slide—Aviva currently sells no constant-air products.  Also in 2007, Target stopped selling Aviva's inflatable pools and slides in its stores.  That same year, Shoremaster, Inc. acquired Aviva Sports, L.L.C. and created Aviva Sports, Inc. (the plaintiff in this action).  This resulted in significant internal changes at Aviva, including the loss of a number of employees.  Between 2007 and 2010, Aviva's sales of its inflatable pools and slides declined.  By 2010, Aviva's inflatable products generated sales of only approximately $544,290.

---

[2] Unless otherwise stated, the facts described below are undisputed or are those that a reasonable fact-finder could find when viewing the record in the light most favorable to Aviva.

[3] Fixed-air products are products that are inflated and then plugged so that the air remains fixed in the device.  In contrast, a constant-air product is a product that requires continuous inflation through the use of an air compressor.  Compared to fixed air products, constant-air products are generally larger and more expensive.

[4] Manley sells some of its products under the Banzai brand name.  These names will be used interchangeably.

In May 2009, Aviva sued Manley and four retailers for alleged patent infringement[5] and violations of the Lanham Act and Minnesota UDTPA.  According to Aviva, advertisements and/or packaging for ninety-five of Manley's products contain false or fraudulent representations.  Specifically, Aviva argues that Manley superimposed scaled-down images of children onto images of its products to make the products appear larger than they actually are.  Further, Manley supposedly uses larger, custom-made products for its photo shoots, rather than the actual products being advertised.  As a result of this alleged manipulation, Aviva claims that Manley's advertisements violate the statutes' false advertising provisions.  Aviva argues that Manley's false advertising has injured and will continue to injure Aviva through a diversion of sales and loss of goodwill.

## II.    MANLEY'S MOTION FOR SUMMARY JUDGMENT

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  To support an assertion that a fact cannot be or is genuinely disputed, a party must cite "to particular parts of materials in the record," show "that the materials cited do not establish the absence or presence of a genuine dispute," or show "that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(A)-(B).  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).  In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the nonmovant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

---

[5] The patent infringement claims were stayed pending reexamination by the United States Patent and Trademark Office (PTO).  On reexamination, the PTO rejected some of the claims of Aviva's patent.  Aviva is pursuing an administrative appeal of that decision.

**A.  Lanham Act**

The Lanham Act was designed "to protect persons engaged in commerce against false advertising and unfair competition."  *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175 (8th Cir. 1998).  The Act states, in relevant part:

> Any person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof , or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(B) (2006).  A plaintiff can recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action, subject to the principles of equity.  *Id.* § 1117(a).

To establish a false advertising claim under this Act, "a plaintiff must prove: (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce;[6] and (5) the plaintiff has been or is likely to be injured as a result of the false statement."  *United Indus. Corp.*, 140 F.3d at 1180.  "In addition, to recover money damages under the Act, a '[p]laintiff must prove both actual damages and a causal link between defendant's violation and those damages."  *Id.* (citing *Rhone-Poulenc Rorer Pharm., Inc. v. Marion Merrell Dow, Inc.*, 93 F.3d 511, 515 (8th Cir. 1996)).[7]

---

[6] Manley does not contest this element.

[7] Under the Minnesota UDTPA, "[a] person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, the person . . . (5) represents that goods or services have sponsorship, approval,

Aviva alleges that the advertisements and/or packaging for ninety-five different Manley products ("accused products") violate the Lanham Act. Manley argues that Aviva lacks evidence pertaining to at least one of the required Lanham Act elements for each of the ninety-five products, and so the Court should therefore grant summary judgment for all of the accused products. Specifically, Manley argues that "proof as to any one advertisement is not proof as to any other of the Accused Advertisements." Def.'s Mem. Supp. Summ. J. 10. While Manley correctly asserts that each advertisement must be analyzed separately and Aviva must prove each advertisement violated the Lanham Act, this Court does not agree that evidence pertaining to one advertisement cannot constitute evidence for other advertisements. Where there are similar advertisements in similar formats involving similar types of alleged misrepresentations, evidence related to one product might reasonably be considered by the fact-finder when examining advertisements for other similar products. To find otherwise would completely ignore the role of circumstantial evidence.

## B.  Constant-Air Products

Aviva's Lanham Act claim includes advertisements and/or packaging for thirty-two constant-air products. As previously noted, constant-air products are inflatable products that require continuous inflation through the use of an air compressor or blower. These products are generally significantly larger and more expensive than fixed-air inflatable products. Manley

---

characteristics, ingredients, uses, benefits, or quantities that they do not have . . . ; or (13) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." Minn. Stat. § 325D.44, subdiv. 1. The Court's analysis under the Lanham Act applies equally to claims under the Minnesota UDTPA. *See, e.g.*, *3M Innovative Props. Co. v. Dupont Dow Elastomers LLC*, 361 F. Supp. 2d 958, 968 (D. Minn. 2005) ("The same substantive elements are used to judge the deceptive trade practices claim under Minnesota law."); *Buetow v. A.L.S. Enters., Inc.*, 650 F.3d 1178, 1183 (8th Cir. 2011) ("When a commercial plaintiff assert[s] pendent state law claims under these Minnesota statutes in a Lanham Act trademark dispute . . . the pendent claims 'are coextensive with the federal claims.'"); *Grp. Health Plan, Inc. v. Philip Morris Inc.*, 68 F. Supp. 2d 1064, 1069 (D. Minn. 1999) ("Plaintiffs' claim for deceptive trade practices is governed by Minnesota Statute § 325D.44, which requires the same analysis as the federal Lanham Act."); *Med. Graphics Corp. v. Sensormedics Corp.*, 872 F. Supp. 643, 649 (D. Minn. 1994) ("Minnesota federal district courts have found that 'the Minnesota Deceptive Trade Practices Act mirrors the Lanham Act' and thus use the same analysis to evaluate false advertising claims that are made simultaneously under the federal and state statutes.").

sells both fixed-air and constant-air products; Aviva only sells fixed-air products.  In 2007, Aviva presented a prototype of a constant-air slide to Target, but, according to Aviva, it was told that it was not worth entering that market.  Sometime thereafter, Aviva ceased its efforts to produce and sell any constant-air slides.  Manley argues that because Aviva does not sell any constant-air products, it is not a competitor with respect to these products.  Thus, Manley asserts, Aviva lacks standing to bring its false advertising claims related to these thirty-two products.

Section 43(a) of the Lanham Act provides that "any person who believes that he or she is or is likely to be damaged" may bring a civil action.  15 U.S.C. § 1125(a)(1).  The Eighth Circuit has not yet adopted a framework from which to determine standing.  However, other circuits have articulated three approaches: (1) a categorical test, requiring that the plaintiff and the defendant be competitors; (2) a five-factor aggregate test, first recognized in *Conte Bros. Automotive, Inc. v. Quaker State-Slick 50, Inc.*, 165 F.3d 221 (3d Cir. 1998); and (3) a reasonable interest test.  In this case, however, it is unnecessary to evaluate Aviva's standing under each of these tests because Aviva has presented absolutely no evidence that its products compete with Manley's constant-air products, that constant-air products and fixed-air products occupy the same market, or that Manley's advertising (false or otherwise) of these products caused or is likely to cause Aviva any injury.  Manley's constant-air products are significantly different in price and size than fixed-air products, such as those sold by Aviva.  The record is devoid of any evidence that fixed-air products and constant-air products compete for the same consumers, are advertised in a similar manner, share important characteristics, are perceived in a similar way by consumers or industry, or are in any way considered to be part of the same market.  Without any evidence indicating an overlap between these two markets, any injury Aviva alleges was caused, or is likely to be caused, by Manley's sale of its constant-air products is entirely speculative.

Aviva argues that any failure to compete in the constant-air market was due to Manley's false advertising, which supposedly prevented it from entering that market. Citing *Porous Media Corp. v. Pall Corp.*, 173 F.3d 1109 (8th Cir. 1999), and *ALPO Petfoods, Inc. v. Ralston Purina Co.*, 997 F.2d 949 (D.C. Cir. 1993), Aviva argues that the lost opportunity to enter the "next level" of the market is a cognizable loss, even without direct competition. Neither of the two cited cases deal with a plaintiff's standing to bring a Lanham Act claim—they instead focus on the appropriate award of damages. Further, the cases involve substantially different facts, making them inapplicable here.

In *Porous Media*, the plaintiff presented evidence that the defendant's deceptive comparative advertising caused the plaintiff to lose the "opportunity to 'create a *reputation* for being the industry leader'" and damaged its "efforts to 'creat[e] a *reputation* to be able to move onto the next level.'" 173 F.3d at 1122. Unlike Aviva, the *Porous* plaintiff was focusing on its *reputational* injury, not lost sales in a market which it had not yet entered. Here, there is no evidence of what Aviva's reputation was, is, or could have been. Aviva has not argued that its reputation has suffered as a result of Manley's allegedly false advertising.

In *ALPO Petfoods*, the appellate court affirmed the district court's award of profits based upon the plaintiff's delayed income stream. 997 F.2d at 954. In that case, the plaintiff planned on expanding from its regional east coast test market to a national market, but as a result of the defendant's advertising, the plaintiff had to defer its national expansion. *Id.* at 953. The court allowed for the recovery of lost profits due to the delay, basing the award upon the plaintiff's projections "prepared in the ordinary course of business and on the basis of which [the plaintiff] was prepared to risk its own capital." *Id.* at 954. Aviva differs from the *ALPO* plaintiff in three critical ways. First, in *ALPO* there was a clear causal link between the defendant's advertising

7

campaign and the delay in the plaintiff's national expansion. Aviva has presented evidence only that it was told "not to bother pursuing larger constant air inflatables" because Manley already "owned the category." Pl.'s Mem. Opp. Summ. J. Ex. 25 ¶ 5 (Decl. Chad Brewer). There is nothing in the record indicating that Aviva's failure to enter that market was caused by Manley's false advertising. Second, the *ALPO* court examined the delayed expansion of a product already on the market. In contrast, Aviva wants the Court to consider its lost opportunity to introduce a *new* product into the market. Third, the *ALPO* court's award of damages was based on detailed financial projections, prepared in the ordinary course of business. *Id.* Aviva, however, has produced no such records. There is no evidence in the record that Aviva *would have* entered the constant-air market, nor what reasonable projected profits from such entry might have been. Aviva's entry into the constant-air market and its lost profits in that market are entirely speculative.

For the reasons stated above, the Court grants Manley's Motion for Summary Judgment with respect to these thirty-two constant air products.

## C. False Statement

To establish a false advertising claim under the Lanham Act, a plaintiff must prove the defendant made a false statement of fact in a commercial advertisement about its own or another's product. *United Indus. Corp.*, 140 F.3d at 1180.[8] There are two categories of false statements: "(1) commercial claims that are literally false as a factual matter; and (2) claims that

---

[8] There is some disagreement whether literal falsity is a question of fact or law. *See Buetow*, 650 F.3d at 1186 n.5. *Compare United Indus. Corp.*, 140 F.3d at 1182 (applying the "clearly erroneous" standard when reviewing the district court's determination regarding literal falsity), *and 3M Innovated Props. Co.*, 361 F. Supp. 2d at 970 ("Literal falsity is often a fact question reserved for the jury."), *with Allsup, Inc. v. Advantage 2000 Consultants Inc.*, 428 F.3d 1135, 1138 (8th Cir. 2005) ("A literally false statement can be determined as a matter of law, but whether a statement is misleading is considered a matter of fact."). "Literal falsity is determined through a two-step process. First, the fact finder must consider whether the advertising conveys an explicit factual message. Second, the fact finder must consider whether that factual message is false." *3M Innovative Props. Co.*, 361 F. Supp. 2d at 969. Given the fact-intensive nature of this inquiry, here the issue of literal falsity is best left for the jury.

may be literally true or ambiguous but which implicitly convey a false impression, are misleading in context, or likely to deceive consumers." *Id.* "In assessing whether an advertisement is literally false, a court must analyze the message conveyed within its full context." *Id.* In some cases, a visual image may be literally false. *Id.* at 1180-81. "The standard for proving literal falsity is rigorous. '[O]nly an *unambiguous* message can be literally false.' When an ad 'can reasonably be understood as conveying different messages, [a] literal falsity argument must fail.'" *Buetow v. A.L.S. Enters., Inc.*, 650 F.3d 1178, 1185 (8th Cir. 2011). "The greater the degree to which a message relies upon the viewer or consumer to integrate its components and draw the apparent conclusion, however, the less likely it is that a finding of literal falsity will be supported. Commercial claims that are implicit, attenuated, or merely suggestive usually cannot be fairly characterized as literally false." *United Indus. Corp.*, 140 F.3d at 1181.

Aviva argues that the allegedly manipulated product images in Manley's advertisements render the advertisements, in their entirety, literally false. Aviva has presented the testimony of Rachel Harris and Peter Kallemeyn, two individuals who were involved with the design and creation of Manley's product packaging and advertising.[9] Harris began working on Manley products in 2008. As the director of creative services, Harris managed the photo shoots, packaging, and commercials. Harris Dep. 24:3-18. She testified that the products used for photo shoots were custom-made items that were roughly twenty percent larger than the actual product being sold. *Id.* at 61:4-19. In addition, she was instructed to miniaturize the children in the images to make the products look larger. *Id.* at 61:24-62:7. She stated that this was done for

---

[9] There is ongoing dispute regarding the company for whom these employees worked. Aviva argues that Manley, Toyquest, Aquawood, and SLB Toys are one and the same—Manley disagrees. The Court finds it unnecessary to resolve this dispute at this time. The Lanham Act holds liable anyone who "uses in commerce" any false description or representation which misrepresents the goods. In cases involving literal falsity, the Act does not require intent, nor does it require that the liable party be the one who designed or created the false advertising.

"[a]lmost every package." *Id.* at 62:14.  Kallemeyn was a senior packaging designer from June

2007 until April 2009.  Kallemeyn Decl. ¶ 1.  His job duties including packaging design and

photo-shoots.  *Id.* at ¶ 2.  He declared that "all of the design team, myself included were

specifically directed to misrepresent the size of every Banzai product in its product packaging

and advertising, as well as most other Manley Toys product lines."  *Id.* at ¶ 9.  He also stated that

"the actual products photographed for the Banzai advertisements and product packaging are

custom made, and are 25% larger than those actually sold in the packaging."  *Id.* at ¶ 3.  "[T]he

children depicted in the Banzai advertising are then photoshopped into the photographs, and

reduced in size to make the Banzai product appear even larger."  *Id.* at ¶ 4; Kallemeyn Dep.

107:18-110:4.

Manley argues that a reasonable juror could not conclude that Manley falsely advertised

products prior to 2007, when neither Harris nor Kallemeyn were involved in Manley's

advertising.  Further, Manley argues that neither Harris nor Kallemeyn testified as to the specific

ninety-five products at issue.  Although Harris and Kallemeyn do not provide specific evidence

of manipulation as to any particular Manley advertisement, their testimony as to the general

advertising practices for Manley products is evidence from which a jury can infer that images in

the ninety-five advertisements were altered so as to be literally false.  Additionally, a jury may be

able to infer that similar advertising practices existed prior to 2007, especially if the jury finds

the pre-2007 advertisements to be similar to the post-2007 advertisements.[10]

Aviva also has the testimony from its expert witness, Dr. David Krauss (Krauss).  Krauss

physically examined twenty-six Manley products and analyzed the images of thirty-six

additional products.  Based on his investigation, he concluded that "many of the Manley Toys

---

[10] In fact, Manley even states in its Reply Memorandum that "[t]here is no evidence that Manley's advertising
practices changed in any way in or after 2005."  Def.'s Reply Mem. Supp. Summ. J. 8.

product packages misrepresent the size of the products contained in the box by shrinking the children, relative to the products, who are shown in the promotional images." Further, "the magnitude of the differential scaling between the children and the products is such that young children (ages 5-10 years old) are often portrayed to be the size of toddlers or babies." Krauss Rep. 2.

Even though Krauss did not analyze thirty-three of the ninety-five accused products, expert testimony is not necessarily required. *See, e.g.*, *ADT Sec. Servs., Inc. v. Swenson*, Civil No. 07-2983 (JRT/AJB), 2011 WL 1084031, at *36 (D. Minn. Mar. 21, 2011) (stating that "[a] jury does not need expert testimony" when "common sense will suffice"). Aviva also has some of the actual Manley products themselves, along with photographs of children using the Manley products. The jury could reasonably conclude that at the very least, those product advertisements are literally false. Further, the jury can compare the images of products Aviva does not possess and were not analyzed by Krauss to products Aviva does possess or did analyze, in order to assess the products' similarity and whether those advertisements, too, are literally false.

Aviva has presented sufficient evidence from which a jury could conclude that the advertisements as whole are literally false.[11] Viewing the evidence in the light most favorable to Aviva, there is a genuine dispute of material fact with respect to the sixty-three fixed-air products.

**D.  Consumer Deception**

The second element of the Lanham Act is proof that the statement actually deceived or has the tendency to deceive a substantial segment of its audience. *United Indus. Corp.*, 140 F.3d

---

[11] Manley persistently argues that evidence that the images alone are false is insufficient for a jury to conclude that the advertisements, taken as a whole, are false. The Court disagrees. While the jury must examine "the message conveyed within its full context" when determining that it is literally false, a jury could reasonably conclude that if the images misrepresent the size of the product, then the advertisement as a whole is literally false.

at 1180.  "Where a commercial claim is not literally false but is misleading in context, proof that

the advertising actually conveyed the implied message and thereby deceived a significant portion

of the recipients becomes critical."  *Id.* at 1182.  "[U]nless a commercial claim is literally false,

or a trier of fact has determined that a competitor acted willfully with intent to deceive or in bad

faith, a party seeking relief under this section of the Lanham Act bears the ultimate burden of

proving actual deception by using reliable consumer or market research."  *Id.* at 1183.  However,

if a claim is found to be literally false, then the Plaintiff need not prove consumer deception.  *Id.*

at 1180.

There is sufficient evidence to allow a reasonable fact finder to conclude that Manley's

advertisements are literally false.  If the fact finder so concludes, then Aviva is entitled to a

presumption of consumer deception and need not prove this element.  Therefore, it is

inappropriate for the Court to grant summary judgment based on Aviva's evidence, or possible

lack thereof, for this element.

**E.  Materiality**

A Lanham Act plaintiff must prove that the deception is likely to influence consumers'

purchasing decisions.  *United Indus. Corp.*, 140 F.3d at 1180; *see also 3M Innovative Props. Co.*

*v. Dupont Dow Elastomers LLC*, 361 F. Supp. 2d 958, 971 (D. Minn. 2005) ("Materiality . . .

considers 'whether the false or misleading statement is likely to make a difference to

purchasers.'").  Even where literal falsity is established, materiality is not presumed.  361 F.

Supp. 2d at 971.

Aviva has presented the deposition testimony of two consumers, both of who testified

that the product images affected their purchasing decisions.  Amy Detweiler, a Manley pool

customer and mother of two children, testified that size was "very much" a part of her buying

decision and that "it was important that it was able to accommodate both children."  Detweiler

Dep. 7:16-22.  Julie Bangs testified that the picture on the box was crucial to her purchasing

decision.  Bangs Dep. 13:24-14:1.  Manley, citing *3M Innovative Properties*, 361 F. Supp. 2d at

972, argues that the testimony of only one consumer per product is insufficient to prove

materiality.  This argument is without merit.  In *3M Innovative Properties*, the plaintiff deposed

only one customer and did not ask that customer what factors influenced his purchasing

decisions.  *Id.*  With no admissible evidence that consumers relied on the allegedly false

statements, the court granted summary judgment on the element of materiality.  *Id.*  The *3M*

*Innovative Properties* court did not say that the testimony of just one customer is insufficient—it

held that the testimony of that particular customer, which lacked any evidence related to the

factors influencing that customer's purchasing decisions, was insufficient.  In contrast, the two

consumers that Aviva has deposed both testified that the images of Manley's products influenced

their purchasing decisions.

　　　Manley also has the report and testimony of its expert Hal Poret (Poret).  Poret conducted

a consumer study, in which nearly half of the participants were shown the image and description

of a Manley product as it appears in advertisements and packaging.  The remaining participants

were shown an allegedly "accurate" image (along with the same description) of the Manley

product.  Both groups were also shown images and descriptions of three other products,

including an Aviva product.  After reviewing all four products, participants indicated their first,

second, third, and fourth choice and explained the reasons for their decisions.  The results

showed that in the group shown the advertised image, 69% would have selected the Manley

product as their first choice and 10% would have selected the Aviva product as their first choice.

In the group shown the allegedly "accurate" image, 25% would have selected the Manley

product as their first choice and 28% would have selected the Aviva product as their first choice. Poret concluded that the use of the allegedly "accurate" image had a material impact on consumers' decisions to purchase the Manley product. Further, more consumers would have chosen the Aviva product had it not been for Manley's allegedly false advertising. As discussed below, the Court finds Poret's testimony to be both relevant and reliable, satisfying the requirements of Rule 702 of the Federal Rules of Civil Procedure. The results of Poret's study can reasonably provide circumstantial evidence of materiality with respect to the other Manley products that were not included in this study. Therefore, taking the evidence in the light most favorable to Aviva, there is sufficient evidence of materiality so as to avoid summary judgment.

## F.  Injury, or Likelihood of Injury, and Causation

The Lanham Act requires that "the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products." *United Indus. Corp.*, 140 F.3d at 1180. The plaintiff's burden for this element depends on what type of relief is sought. The Lanham Act allows the court to grant injunctions, 15 U.S.C. § 1116(a), and also permits the recovery of: (1) the defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. *Id.* § 1117(a).

### 1.  *Injunctive Relief*

When seeking an injunction, a plaintiff must prove injury, or likelihood of injury, and a causal link between that injury and the defendant's conduct. A plaintiff must show more than just a subjective belief of injury. *See Blue Dane Simmental Corp. v. Am. Simmental Ass'n*, 178 F.3d 1035, 1043 (8th Cir. 1999) (finding no proof of damages where plaintiff's evidence established only "that they believed that their sales had dropped because of the introduction of

[defendant's product]"); *see also Johnson & Johnson v. Carter-Wallace, Inc.*, 631 F.2d 186, 189

(2d Cir. 1980) (requiring "something more than a plaintiff's mere subjective belief that he is

injured or likely to be damaged").  However, a plaintiff does not have to prove specific damage.

*Porous Media Corp.*, 110 F.3d at 1335; *see also Johnson & Johnson*, 631 F.2d at 190 ("The

correct standard is whether it is *likely* that [defendant]'s advertising has caused or will cause a

loss of [plaintiff] sales, not whether [plaintiff] has come forward with specific evidence that

[defendant]'s ads actually resulted in some definite loss of sales.").

> Since § 43(a) was passed to protect consumers as well as competitors, the courts are not and should not be reluctant to allow a commercial plaintiff to obtain an injunction even where the likelihood of provable impact on the plaintiff may be subtle and slight.  Congressional policy appears to encourage commercial firms to act as the fabled "vicarious avenger" of consumer rights.  An injunction, as opposed to money damages, is no windfall to the commercial plaintiff.  An injunction protects both consumers and the commercial plaintiff from continuing acts of false advertising.

*Porous Media Corp.* 110 F.3d at 1335 n.8 (citing 3 J. Thomas McCarthy, McCarthy on

Trademarks and Unfair Competition § 27.04(3)(d), at 27-48 (3rd ed. 1996)); *see also Johnson &*

*Johnson*, 631 F.2d at 192 ("Failure to prove actual damages in an injunction suit, as

distinguished from an action for damages, poses no likelihood of a windfall for the plaintiff.  The

complaining competitor gains no more than that to which it is already entitled—a market free of

false advertising.").

Poret's consumer study is evidence that because of Manley's allegedly false advertising,

"consumers considering both parties' inflatable children's pools are more likely to purchase the

Banzai product over the Aviva product."  Poret Rep. 17.  Manley and Aviva's products are sold

by some of the same retailers, and at the very least, can both be found for sale on the Internet.

This evidence sufficiently demonstrates a likelihood of injury, and a causal nexus between that

possible injury and Manley's allegedly false advertising.  Aviva need not prove more to obtain injunctive relief.

### 2. *Monetary Damages*

When seeking money damages, a plaintiff "must prove both actual damages and a causal link between defendant's violation and those damages." *Rhone-Poulenc Rorer Pharm., Inc.*, 93 F.3d at 515; *see also 3M Innovative Props.*, 361 F. Supp. 2d at 972 ("The Eighth Circuit requires the plaintiff to prove causation in fact in a non-comparative advertising case.").  As the Eighth Circuit Court of Appeals has explained, "[i]n a suit for money damages where a defendant misrepresented its own product but did not specifically target a competing product, plaintiff may be only one of many competitors, and without proof of causation and specific injury each competitor might receive a windfall unrelated to its own damage." *Porous Media Corp.*, 110 F.3d at 1335-36.  Any award of damages must serve as compensation, not a penalty.  *See* 15 U.S.C. § 1117(a).  When assessing actual damages, courts may consider "the difficulty of proving an exact amount of damages from false advertising, as well as the maxim that 'the wrongdoer shall bear the risk of the uncertainty which his own wrong has created.'" *Porous Media Corp.*, 110 F.3d at 1336 (citation omitted).  However, "the court must ensure that the record adequately supports all items of damages claimed and establishes a causal link between the damages and the defendant's conduct, lest the award become speculative or violate [Lanham Act] section 35(a)'s prohibition against punishment." *Id.*  While the plaintiff must prove the *fact* of damage with certainty, it need not prove the *amount* of damage with certainty.  *See Minn. Pet-Breeders, Inc. v. Schell & Kampeter, Inc.*, 843 F. Supp. 506, 519 (D. Minn. 1993).

As evidence of damage caused by Manley's false advertising, Aviva points to the erosion of its revenues when Manley entered the inflatable pool and slide market, along with a

concurrent increase in Manley's revenues.  Aviva also highlights the loss of Target as a client with Target's continued sale of Manley products.  Relying on *EFCO Corp. v. Symons Corp.*, 219 F.3d 734, 740 (8th Cir. 2000), Aviva argues that evidence of an erosion of its revenues, Manley's increased revenues, and Aviva's lost sales to Manley is sufficient to establish causation.  The *EFCO* court found sufficient evidence of causation where there was a connection between the plaintiff's and defendant's revenues, along with evidence that plaintiff's "sales force was losing clients to [defendant]."  *Id.*  This allowed for "an inference that the shift in the companies' market shares was due to [defendant's] misconduct."  *Id.  EFCO*, however, involved comparative advertising.  The court in *3M Innovative Properties*, 361 F. Supp. 2d at 973, distinguished between comparative and non-comparative advertising cases, finding that in a non-comparative advertising case, evidence of plaintiff's decreased sales, defendant's increased sales, and plaintiff's loss of sales to the defendant did not sufficiently prove causation.  The court found that "a reasonable jury could not find that [defendant's] alleged false advertising is the cause of [plaintiff's] claimed damages."  *Id.*  The damages expert "calculate[d] damages after assuming that the false advertising caused [plaintiff's] lost profits."  *Id.*  The court stated that "the change in the parties' sales positions is simply that, a change.  But is has not been linked to the specific advertising claims challenged here, an critical omission given the many claims made in this advertising."  *Id.*

Aviva has pointed to the loss of only one customer to Manley: Target.  But Aviva has presented no evidence that this loss was due to Manley's false advertising.  Chad Brewer, an owner of Aviva from 2002-2007, declared that "[i]n 2007 we were knocked out of Target at Target's competitive line review (CLR).  We loss [sic] to Banzai at the CLR."  Brewer Decl. ¶ 10.  This loss "resulted in no Aviva inflatable products being carried at Target."  *Id.* at ¶ 11.

Aviva's only explanation for this loss was price competitiveness—not false advertising. Bowhall Dep. 50:17-23, 67:15-23, 81:3-7; Brewer Dep. 89:14-22.  Since the advertising at issue is not comparative advertising, Aviva must be able to prove that its losses were caused by Manley's alleged misconduct.

Aviva attempts to show causation by comparing the increased sales of Aviva's other products to its declining sales of inflatable pool and water products.  According to Aviva's damages expert, Aviva's non-pool and slide business operated in a similar market, faced lawful marketplace competition, and experienced the same internal influences and economic pressures as Aviva's pool and slide business.  Thus, any difference between the market performances of these two businesses must have been caused by Manley's false advertising.  This reasoning fails to account for consumer purchasing decisions that were made for reasons other than the challenged advertising—a requirement to prove causation.  *See 3M Innovative Properties*, 361 F. Supp. 2d at 973 (finding no evidence of causation where "[plaintiff] has not accounted for customer purchasing decisions that were made for reasons other than the challenged advertising").  First, there is no evidence in the record that Aviva's non-pool and slide business faced similar types of competition as its pool and slide business.  Additionally, Aviva claims that it had once been the only player in the inflatable pool and slide market.  But by the time of this lawsuit, competitors other than Manley, such as Intex, Wham-O, and Little Tikes, apparently also began selling similar products.[12]  Even if Aviva's losses were due to Manley's entry into the market, rather than the entry of these other competitors, there is no evidence in the record that Aviva's losses were due to Manley's *false advertising*.  Aviva does not account for other factors that might have contributed to Manley's success—such as Manley's greater physical presence on

---

[12] In fact, Poret's consumer study included similar inflatable products sold by Intex and Little Tikes.

retailers' shelves or attractive licensing agreements.[13]  Without evidence connecting Manley's advertising practices to Aviva's losses, a jury would have to make too great an analytical leap to conclude that Aviva's losses were caused by Manley's false advertising.

The Court also finds Aviva's argument that it may recover damages for its "lost business opportunity" to be unpersuasive.  As stated above, there is no evidence in the record that Aviva would have entered the constant-air market but for Manley's false advertising.  Nor are there reliable projections as to how those products might have performed in the market.  Any damages related to Aviva's theoretical entry into the constant-air market would be purely speculative.

Finally, Poret's consumer study only examined one Manley product and one Aviva product.  It was admittedly "not designed to quantify the number of sales gained or lost due to use of the Enlarged Image on Banzai products or to quantify damages due to use of the Enlarged Image."  Poret Rep. 2.  Thus, while his study sufficiently sets forth evidence of likelihood of injury and causation, it does not meet the heightened evidentiary requirements for recovering monetary damages.

In conclusion, while Aviva's damages expert has calculated the amount of claimed damages, there is no evidence linking these damages to Manley's false advertising.  Based on the record and taking all reasonable inferences in Aviva's favor, the Court concludes that Aviva has not presented evidence that would allow a reasonable jury to rule in its favor on the issue of actual damages and causation.

### 3. *Disgorgement of Profits*

"Section 1117 [of the Lanham Act] makes an award of the infringing party's profits subject only to the principles of equity.  Disgorgement exists to deter would-be infringers and to

---

[13] For example, Manley has various licensing agreements which allow it to use popular characters and names on its products—possibly making them more appealing to consumers.

safeguard against unjust enrichment." *Masters v. UHS of Del., Inc.*, 631 F.3d 464, 473 (8th Cir. 2011).[14]  "An award of monetary relief under the Lanham Act must be compensatory, not a penalty.  It does not follow, however, that a finding of damages is a precondition of any monetary award." *Id.* at 474 (citations omitted); *see also Safco Prods. Co. v. Welcom Prods., Inc.*, Civil No. 08-4918(SRN/JJG), 2011 WL 2601838 (D. Minn. July 1, 2011) (applying *Masters* to a Lanham Act counterclaim for false designation of origin under 15 U.S.C. § 1125(a)(1)(B)).  "The Lanham Act . . . establishes its own flexible statutory remedial scheme" and "the fact that [the claimant] has not—and apparently cannot—support a claim of any actual damages would not necessarily warrant summary judgment." *Safco Prods. Co.*, 2011 WL 2601838, at *23.

　　　　To recover profits, "the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." 15 U.S.C. § 1117(a); *see also Safco Products Co.*, 2011 WL 2601838, at *24.  In the context of trademark infringement, the United States Supreme Court has stated that the infringer has the burden to "isolate the profits which are attributable to the use of the infringing mark." *Mishawaka Rubber & Woolen Mfg.*

---

[14] There appears to be a division in this District as to whether willfulness is required to recover profits.  *See Am. Ass'n for Justice v. Am. Trial Lawyers Ass'n*, 698 F. Supp. 2d 1129, 1147 n.23 (D. Minn. 2010).  Prior to 1999, the Eighth Circuit required willfulness in order to disgorge profits.  *See Minnesota Pet-Breeders, Inc. v. Schell & Kampeter, Inc.*, 41 F.3d 1242, 1247 (8th Cir. 1994).  However, the 1999 amendments to section 1117 of the Lanham Act appear to have removed this requirement.  *See Wildlife Research Ctr., Inc. v. Robinson Outdoors, Inc.*, 409 F. Supp. 2d 1131, 1136 (D. Minn. 2005) (citing the Third and Fifth Circuit Courts and noting that the 1999 amendment to section 1117(a) of the Lanham Act removed any willfulness requirement for claims based on false or misleading advertising).  The Eighth Circuit has not yet clarified the effect of the 1999 amendments.  *See Masters*, 631 F.3d at 471 n.2.  Two district court cases continued to impose a willfulness requirement after 1999.  The court in *Minnesota Specialty Crops, Inc. v. Minnesota Wild Hockey Club, LP*, No. Civ. 00-2317 JRTFLN, 2002 WL 1763999, at *9 (D. Minn. July 26, 2002), did not discuss the 1999 amendments or their effect on the willfulness requirement, but instead relied solely upon *Minnesota Pet-Breeders*, an Eighth Circuit decision from 1994.  In *Lutheran Association of Missionaries & Pilots, Inc. v. Lutheran Association of Missionaries & Pilots, Inc.*, No. Civ. 03-6171 PAM/RLE, 2005 WL 629605, at *7 (D. Minn. Mar. 15, 2005), the court relied upon the *Minnesota Specialty Crops* decision— which did not consider the 1999 amendments.  This Court therefore declines to follow the reasoning of these two decisions.  In *Safco Products Co.*, 2011 WL 2601838, at *25, the district court concluded  "that Section 1117(a) generally does not require willfulness, except where an award of the wrongdoer's profits would be based on the deterrence rational[e], but that willfulness is a relevant factor" and subject to the court's equitable discretion.  This Court likewise concludes that willfulness is not required for the award of defendant's profits, although it may be a factor to consider.

*Co. v. S.S. Kresge Co.,* 316 U.S. 203, 206-07 (1942).  If he cannot or does not do so, "[t]here

may well be a windfall to the trade-mark owner . . . .  But to hold otherwise would give the

windfall to the wrongdoer."  *Id.*; *see also Pandora Jewelers 1995, Inc. v. Pandora Jewelry, LLC*,

No. 09-61490-Civ., 2011 WL 2295269, at *4 (S.D. Fla. June 8, 2011) (stating that the infringer

has the burden of proving "any proportion of its total profits which may not have been due to the

infringement" and if he fails to do so "the plaintiff's entitlement to profits under the Lanham Act

is equal the infringer's gross sales."); 5 J. Thomas McCarthy, McCarthy on Trademarks and

Unfair Competition § 30:65 (4th ed.) ("Under the federal Lanham Act, as well as the common

law, it is the infringer's burden to prove any proportion of his total profits which may not have

been due to use of the infringing mark.").

      In *Rexall Sundown, Inc. v. Perrigo Co.*, 707 F. Supp. 2d 357, 359 (E.D.N.Y. 2010), the

court held that a plaintiff in a Lanham Act false advertising case "must establish only the

defendant's sales of the product at issue; the defendant bears the burden of showing all costs and

deductions, including any portion of sales that was not due to the allegedly false advertising."

The court found that the plain language of the Lanham Act only required the plaintiff to prove

sales.  "It does not say that it is plaintiff's burden to prove, for example, 'sales due to the false

advertising' or 'sales due to the violative conduct.'"  *Id.*  The court also refused to find any

distinction between trademark infringement claims and false advertising claims.  *Id.* at 361.

"Nothing in § 1117's text or Second Circuit case law . . . indicates that the burden of

apportionment varies with the cause of action asserted."  *Id.*  After examining section 1117's

history, the court found that "Congress gave no indication that different burdens of

apportionment would apply to different Lanham Act causes of action."  *Id.* at 361-62.

The Court finds the reasoning in *Rexall Sundown* to be persuasive.  To be entitled to recover profits, Aviva must only prove Manley's sales of the allegedly falsely advertised products.  If Manley fails to prove the sales not due to the allegedly violative conduct, Aviva may be entitled to all of Manley's profits from the allegedly falsely advertised products—subject only to the principles of equity. [15]  Aviva has sufficient evidence of a likelihood of injury caused by Manley's allegedly false advertising.  Aviva's damages expert presented evidence of Manley's sales of and profits from the allegedly violative products.  Manley argues that the damages expert applied an incorrect profit margin for her calculations of Manley's profits.  This argument is irrelevant because the expert was not required to calculate profits at all—she was merely required to calculate sales.  It is *Manley's* burden to prove any costs or deductions.  Aviva has presented sufficient evidence to allow a recovery of Manley's profits.

## G.  Conclusion

For the reasons stated above, the Court cannot conclude that Manley has demonstrated that there is no disputed issue of material fact as to the Lanham Act elements of falsity, materiality, injury or likelihood of injury, causation, and profits.  However, Aviva has failed to

---

[15] Further, the Lanham Act does not explicitly limit the plaintiff's recovery to only the profits earned because of the false advertising.  "[T]he district court is given broad discretion to award the monetary relief necessary to serve the interests of justice, provided it does not award such relief as a penalty."  *Metric & Multistandard Components Corp. v. Metric's Inc.*, 635 F.2d 710, 715 (8th Cir. 1980).  In *Truck Equipment Service Co. v. Fruehauf Corp.*, 536 F.2d 1210, 1223 (8th Cir. 1976), the Eighth Circuit Court of Appeals reversed the district court's award of only twenty percent of the defendant's profits, remanding the case for "entry of judgment in that amount which will award [plaintiff] all of [defendant's] profits from sales of the [violative products]."  Even though the district court found that only twenty percent of the sales were attributable to defendant's unlawful conduct, the Eighth Circuit held that "equity requires that [defendant] relinquish all of its profits from the sales" of the violative product.  *Id.* at 1222.  "[S]uch relief is necessary as a deterrence to willful infringement."  *Id.*  Citing the Second Circuit opinion in *W.E. Bassett Co. v. Revlon Inc.*, 435 F.2d 656, 664 (2d Cir. 1970), the court noted that "the only way the courts can fashion a strong enough deterrent is to see to it that a company found guilty of willful infringement shall lose *all* its profits from its use of the infringing mark."  536 F.2d at 1222 (emphasis in original).  While not appropriate in every case, "[t]he award of only twenty percent of [defendant's] profits is clearly inadequate to ensure that similar conduct will not reoccur in the future."  *Id.* at 1223.  Thus, a successful Lanham Act plaintiff is not necessarily limited to "relief from the infringement only to the extent that [defendant] had been unjustly enriched."  *Id.* at 1222.  Notably, in *Truck Equipment Service Co.* it was the *defendant* who presented evidence of a market survey to show that only twenty percent of its sales were attributable to its unlawful conduct—the plaintiff did not have to present this evidence.

set forth any evidence from which a reasonable juror could conclude that its actual losses were caused by Manley's alleged false advertising.  Manley's Motion for Summary judgment is granted as to the issue of actual monetary damages only.  For all other issues, summary judgment is denied.

### III.    MOTIONS TO EXCLUDE EXPERT TESTIMONY

Manley moves to exclude the expert testimony of Aviva's experts Hal Poret, Dr. Michael Houston, Dr. David Krauss, and Frances McCloskey under Rule 702 of the Federal Rules of Evidence.  Aviva also moves to exclude the testimony of Manley's four rebuttal experts, Thomas J. Maronick, Dr. Robert C. Sugarman, Dr. Larry Chiagouris, and Sidney P. Blum.

Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

When evaluating the admissibility of expert testimony, a trial court serves as the "gatekeeper" that ensures the reliability and relevance of the expert testimony offered into evidence.  *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 149 (1999).  The proponent of the proposed expert testimony must demonstrate its admissibility by a preponderance of the evidence.  *Lauzon v. Senco Prods., Inc.,* 270 F.3d 681, 686 (8th Cir. 2001).  Proposed expert testimony must meet three prerequisites to be admitted under Rule 702.  *Id.*  First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact.  *Id.*  Second, the proposed expert witness must be qualified to assist the finder of fact.  *Id.*  Third, the proposed testimony must be reliable or trustworthy in

23

an evidentiary sense.  *Id.*  To satisfy the third requirement, the proposed testimony must be based

on sufficient facts or data, the proposed testimony must be the product of reliable principles and

methods, and the proposed expert witness must have applied the principles and methods reliably

to the facts of the case.  *Id.*  "Courts should resolve doubts regarding the usefulness of an

expert's testimony in favor of admissibility."  *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748,

758 (8th Cir. 2006).  "As a general rule, the factual basis of an expert opinion goes to the

credibility of the testimony, not the admissibility, and it is up to the opposing party to examine

the factual basis for the opinion in cross-examination."  *Bonner v. ISP Techs., Inc.*, 259 F.3d 924,

929 (8th Cir. 2001) (citations omitted).  However, an expert's opinion must be excluded if it "is

so fundamentally unsupported that it can offer no assistance to the jury."  *Id.* at 829-30 (citations

omitted).

## A.  Declarations of Experts

As a preliminary matter, Manley argues that the Court cannot consider the "belated

declarations" of Aviva's experts McCloskey, Krauss, and Poret, which were submitted in

response to the motions to exclude each expert.  Citing Federal Rule of Civil Procedure 37(c)(1),

Manley argues that these declaration are "new opinions" which were "submitted outside the

discovery deadline."  Def.'s Reply Mem. Supp. Mot. Exclude Frances McCloskey 14.  The Court

does not find that these declarations contain "new opinions"—they contain no new material

information and present no opinions that were not provided during discovery.  The experts'

declarations merely clarify their reports in response to questions raised in Manley's *Daubert*

motions.  These are not "supplemental reports" submitted after the expert deadline, nor do they

result in "sandbag[ging] one's opponent with claims and issues which should have been included

in the expert witness' report."  *Beller ex rel. Beller v. United States,* 221 F.R.D. 696, 701

(D.N.M. 2003).  Is proper for the court to consider these declarations when deciding the admissibility of these experts.

**B.  Hal Poret**

Aviva retained Hal Poret (Poret) to design and implement a study to prove that Manley's allegedly false advertising was material to consumers' purchasing decisions.  Poret holds bachelor's and master's degrees in mathematics and a JD from Harvard Law School.  He has designed, supervised, and implemented over 350 consumer surveys, over 100 of which have concerned consumer perception of advertising or packaging.  Poret conducted a double-blind randomized mall-intercept study involving 303 qualified participants in eight shopping malls throughout the United States.  The participants were divided into two groups: 150 participants were assigned to a "Test Group," and 153 participants were assigned to a "Control Group."  Each group was shown images and descriptions for four similar inflatable pool products, including one Banzai (Manley) product and one Aviva product.  Both groups were shown the same images for each of the three non-Manley products.  The Test Group was shown an image of the Manley product that was taken from the Amazon.com website (called the "Enlarged Image").  The Control Group was shown an image of the Manley product that was altered so that it was allegedly more accurate with respect to the relative size of the pool and children (called the "Accurate Image").  Participants were asked to review the product information for all four products, and then indicate which product would be their first, second, third, and fourth choice. They were then asked to explain the reasons for their decisions.

The results showed that in the Test Group with the "Enlarged Image," 69% would have selected the Manley product as their first choice and 10% would have selected the Aviva product as their first choice.  In the Control Group with the "Accurate Image," 25% would have selected

the Manley product as their first choice and 28% would have selected the Aviva product as their

first choice.  Additionally, 60% of the Test Group respondents who chose Manley as their first

choice cited size as a reason for their choice; in the Control Group, only 45% gave size as a

reason for choosing the Manley product first.  Among those who chose the Aviva product as

their first choice, size was a reason for 47% in the Test Group, whereas in the Control Group it

was stated as a reason by 81% of the respondents.[16]

Poret concluded that the use of the Enlarged Image had a material impact on consumers'

decisions to purchase the Manley product.  Further, more consumers would have chosen the

Aviva product had it not been for Manley's allegedly false advertising.  Manley does not

challenge Poret's expert qualifications, but does challenge the relevance and reliability of Poret's

testimony.

## 1. *Relevance*

Under the Lanham Act, a plaintiff must prove that a false or misleading description is

likely to influence the consumer's purchasing decision.  Manley argues that Poret's testimony is

irrelevant because he "did not test any consumer's perception of any Manley advertisement taken

as a whole."  Def.s' Mem. Supp. Motion Exclude Hal Poret 10.  Instead, Poret presented "limited

information extracted from [an Internet website]."  *Id.*  According to Manley, "[c]onsideration of

only certain aspects of the advertisement out of context is not relevant to the claim."  The Court

disagrees.  *Id.* at 11.

First, the Court does not find that Poret's study utilized only "limited information."  The

information accompanying the images included descriptions of the products, dimensions, and

price—the same information a consumer would see when viewing the product on a website

(minus the consumer comments, ratings, and consumer-posted images).  Manley argues that

---

[16] Another common reason cited by consumers was "features/accessories."

Poret should have showed the participants entire packages or full internet advertisements.  But as Poret explained, such a study would have been infeasible and unreliable.  First, he could not have created a "Control Group" with an "Accurate Image" if he has to use the actual product packaging—he "had no way to create a comparable 'accurate' physical package to show a Control group."  Sorge Decl. Ex. 2, at 19.  Further, Poret's study would have been rife with flaws had he used actual internet advertisements, complete with consumer comments (and complaints) about the products along with consumer-posted images of the actual products.  Poret's survey method using paper exhibits is a commonly used method and Manley has not identified any information that was critically omitted from Poret's study.  Further, even if Poret's study did only examine limited information, an expert examination of the image alone is relevant to a jury's determination of literal falsity.

Finally, Manley argues Poret's testimony is irrelevant because he used information extracted from the Internet, whereas Manley's products are primarily sold on store shelves and often do not appear alongside Aviva's products.  Poret's study was designed only to demonstrate the effect that the product image had on consumer decisions.  Whether the consumers saw the image in the store or on a website does not affect the relevance Poret's study or conclusions.  Manley's distinction goes to weight and credibility, not admissibility.  Poret's testimony would be helpful to a fact finder when considering materiality.

    2.  **Reliability**

Manley raises a number of issues related to the reliability of Poret's testimony.  First, Manley asserts that there is "absolutely no factual support for Poret's assumption" that the Control Group image (the "Accurate Image") was an accurate depiction of Manley's product.  Def.s' Mem. Supp. Motion Exclude Hal Poret 2.  Manley states that Poret did not create the

"Accurate Image" himself, did not know who created the image or how it was created, and "did nothing to confirm the accuracy of the Control Group image beyond an 'eyeball test' of reasonableness performed by comparing it to unspecified photos on the Internet." *Id.* at 5.  Thus, Manley argues, Poret had no sound basis for his assumption that the Control Group image was accurate—and because his opinion rests upon that assumption, the entire testimony is unreliable, speculative, and inadmissible.

The Court finds that Poret's assumption that the "Accurate Image" was accurate—at least more accurate than the "Enlarged Image"—was not "fundamentally unsupported."  The affidavits of Ryan Sorge and Dr. David Krauss explain precisely how the "Accurate Image" was created.  They relied upon known anthropometric data and basic mathematical formulas to derive the "Accurate Image."  Further, Poret's own "eyeball test" is some evidence that his assumption of accuracy was warranted.  Perhaps most tellingly, Manley has not presented any evidence that the "Accurate Image" was anything other than accurate, at least with respect to the size of the product.  Poret had a sufficient basis for the assumptions underlying his study and Manley can attack this basis on cross-examination and through the presentation of its own evidence.  This concern goes only to the credibility of the testimony, not its admissibility.

Manley next argues that Poret failed to control for six additional variables between the "Enlarged Image" and the "Accurate Image."  These differences include the actual size of the image, the number of children using the product, the number of children actively engaged with the product, the background and landscaping, the coloring of the product, and the image of a girl whose feet were apparently chopped off.  Poret asserts that these differences were either unavoidable or negligible; Manley asserts that Poret cannot determine what effect, if any, these other variables had on the study's results.  The Court does not find these differences to be so

critical that they render Poret's entire methodology flawed and unreliable.  This again goes to the factual basis of the opinion.

The Court also rejects Manley's argument that Poret "failed to explain how other factors, like product features, colors, price and other differences in the surveyed advertisements affect consumer decision-making."  *Id.* at 2.  Poret acknowledged that the products' features and accessories played a large role in consumer decision-making.  He did not opine that size was the *only* factor responsible for consumers' purchasing decisions; he merely concluded that size was the only factor responsible for the *difference* in purchasing decisions between the Control Group and the Test Group.  By keeping the descriptions constant while changing only the image to depict an allegedly more realistic size, Poret effectively focused on the effect of apparent product size on consumer purchasing decisions.  The Lanham Act does not require that the alleged falsehood be the only factor influencing consumer purchasing decisions—it merely "considers 'whether the false or misleading statement is likely to make a difference to purchasers.'" *3M Innovative Props. Co.*, 361 F. Supp. 2d at 971 (citation omitted).  The fact that there was a difference between the product choices among the two groups, when the only variable changed was the image of Manley's product, is reliable evidence that consumer decisions were materially affected by the image, regardless of the other factors.

Finally, Manley argues that Poret's testimony is unreliable because he did not compute a potential or known rate of error.  It is not always necessary for an expert to compute an error rate—in fact, in some cases it is simply not applicable.  Poret explained that for this type of study (a non-probability study), it is inappropriate to compute error rates.  Manley's rebuttal expert stated that Poret *could* have computed such an error rate, but not that Poret *should* have computed an error rate, or that such a computation is appropriate in this sort of study.  Further,

Poret used reliable survey methodology.  Manley identified no problems with Poret's sampling plan, shopping mall selections, respondent selection, interviewing process, check-in procedures, or interviewing period.  Poret conducted a randomized double-blind study involving 303 participants.  He attempted to isolate the effect of represented product size and he asked appropriate questions to ascertain what factors were material to consumers' purchasing decisions.  Given Poret's use of reliable principles and methods, the failure to compute a rate of error is not a basis on which the Court will exclude Poret's testimony.

Overall, Poret's testimony is not "so fundamentally unsupported that it can offer no assistance."  Manley's motion to exclude Poret's testimony is therefore denied.[17]

## C.  Dr. Michael Houston

Aviva retained Dr. Michael Houston (Houston), an expert in consumer behavior and marketing.  Aviva maintains that Houston's testimony addresses the elements of (1) materiality and (2) likelihood of injury and causation.  Houston's report states he was retained to "offer an opinion regarding the causal effects of the visual representation of the nature and size of inflatable water slides and other products."  Houston Rep. 3.  Houston has a PhD in marketing from the University of Illinois at Urbana-Champaign and has extensively studied marketing and consumer behavior.  His research has focused on the impact of visual components embedded in marketing communications on consumers.  He concluded that: (1) the "representation of the size and nature of Banzai water slides and other products resulted in false impressions by consumers;" (2) those "impressions created a false competitive advantage for Banzai that led consumers to pick Banzai over competing brands or not to even consider competing brands at

---

[17] Manley also argues that Poret's opinion should be limited to only the one Manley product he used in his study (Wild Waves Water Park).  For the reasons already explained, the Court finds that this survey is relevant to all the fixed-air products involved in this case.  They involve similar products and similar forms of alleged misrepresentation.  Manley has not offered an explanation as to how the other products or advertisements significantly differ from the one used in the study.

all;" (3) Banzai's market position "would not have reached the levels it did" if consumers "accurately perceived the actual size of the Banzai products;" (4) consumers "would have chosen a different brand" had they perceived the actual size of the Banzai products; (5) Banzai's representations "harmed the ability of other brands such as Aviva to compete in the water toy market;" and (6) post-purchase dissatisfaction with the Banzai brand caused future harm to Manley's competitors since "consumers would turn away from the entire product class." Houston Rep. 13-14.  Manley challenges the reliability and relevance of Houston's testimony.

This Court agrees that there are serious concerns regarding the factual basis for Houston's opinions.  Houston stated during his deposition that he examined "some" of Manley's packaging, representations of a "variety" of Manley's products, "several" consumer complaints (later clarified as "quite a few") posted on various websites, some of the packaging and advertisements of Manley's competitors' products, Aviva's discovery responses, deposition transcripts, and "some" literature.  He kept no record of the products he viewed, the websites he visited, or the number of consumer comments he read.  When asked during his deposition which Manley products he examined, where he examined them, what websites he visited, how many complaints he reviewed, to which products those complaints were related, the source of those complaints, or even the literature he reviewed, he did not know or could not remember.  This lack of factual detail and documentation is concerning, to say the least.

Houston drew broad conclusions regarding the effect of Manley's representations on consumers.  In his report, he states that "[s]ize and benefits associated with it became the dominant attribute consumers considered when making a brand choice of backyard water slides. . . .  Consumers chose the Banzai brand based on its perceived size."  Houston Rep. 12. He concluded that consumers had false impressions of the Manley products, leading to the

purchase of Manley products over other products, and that consumers would have chosen a different brand had it not been for the allegedly misrepresentative images.  The only consumer information Houston relied upon was the deposition testimony of two Manley consumers and various complaints posted on the Internet regarding Manley products.  He had no knowledge or data concerning the people who did not complain, nor did he know what fraction of overall sales the complainers constituted.  Houston Dep. 72:23-73:6.  Thus, he only examined a subset of consumers who (a) purchased a Manley product, and (b) posted a complaint on the internet about that product (or were identified by Aviva as one of the two dissatisfied consumers for purposes of testimony).  Manley calculated that this self-selected group of consumers who posted complaints on the internet did not represent a significant percentage of Manley consumers—in fact, they constituted less than 0.008% of the volume of sales of the ninety-five products.

Houston had no factual basis for forming conclusions related to *non-complaining* consumers.  From the evidence he reviewed, he had no basis for determining what "dominant attribute" they considered, what impressions they formed about Manley products, their reasons for choosing the Banzai brand, or what they would have done if Manley's representations were accurate.  Houston repeatedly stated during his deposition that "many" other consumers would have reacted the same way as the complaining consumers—but he could not say how many or how he knew that other consumers would have done so.  When asked whether he had data upon which to extrapolate from the population of consumers who posted internet complaints to the rest of the consuming public, Houston replied, "Yeah.  I mean, I'm pretty comfortable with that, that other people had the same experience who did not complain."  Houston Dep. 84:24-85-4.  As further clarification, he stated, "That I'm comfortable they're out there."  *Id.* at 85:7.  Based on the limited factual support for Houston's analysis, all he could really conclude is that size was a

key issue to the consumers who complained about the product's size.  His opinions regarding consumers in general are fundamentally unsupported.

Houston also failed to account for other factors that could affect consumers' purchasing decisions.  In his report, Houston describes different decision-making models consumers might employ—but does not explain how many consumers use each type or what type of model was used by consumers of Manley products.  "A disjunctive choice rule based on perceived size was likely employed by many consumers.  Other consumers may have first eliminated brands and product versions not falling into a certain price range and then chose a brand based on perceived size."  Houston Rep. 12.  In his deposition, Houston acknowledged that factors such as price competitiveness and strong distribution systems could also play a role in consumer purchasing decisions and market share.  Houston Dep. 140:6-20.  Despite acknowledging that some consumers may have selected products primarily based on price, and that other factors may play a role, Houston nevertheless concluded that "perceived size provided a competitive, differential advantage to the Banzai brand."  Houston Rep. 12.  He does not explain the role price and these other factors may have played in providing Manley with a competitive advantage—a critical omission.  *See, e.g.*, *Blue Dane Simmental Corp.*, 178 F. 3d at 1040-41; *Children's Broad. Corp. v. Walt Disney Co.*, 245 F.3d 1008 (8th Cir. 2001).  Ultimately, Houston can only say that *some* consumers *may* have applied a decision-making model where they *might* have based a decision on the perceived size of the product.  *See* Houston Dep. 125:7-127:23.

Houston's opinions regarding Manley's and Aviva's market performances and positions are also unsupported.  He believed that Manley was "a market leader," but did not know Manley's market position and was not even sure if Manley *was* a market leader.  Houston Dep. 138:3-5.  His basis for believing that Manley's market position "generally is quite strong" was

"[j]ust from what I was picking up from reading some of the depositions from some of the people that were deposed, and just the sense I picked up I think from interacting with the attorneys and so on." *Id.* at 138:12-16.  Houston opined that Manley's market position "would not have reached the levels it did," but when asked what level Manley would have gotten to, Houston replied, "I don't know.  It wouldn't be where they were at though." *Id.* at 138:17-139:2.  He also opined that consumers would have chosen a different brand had it not been for Manley's allegedly false representations—but when asked how many consumers would have done so, he responded, "I don't know.  I just think there would be a significant number." Houston Dep. 141:16-25.  He did not know what other brand those consumers would have chosen or whether any of them would have chosen an Aviva product. *Id.* at 142:3-23.  Nor did he have information regarding competitors' market performance or ability to compete.  In fact, he stated that he "didn't even really need to know" who Manley's competitors were. *Id.* at 63:24-64:17.  Despite opining that consumers would have chosen Aviva or other competing products over Manley, Houston had no information regarding what consumers thought of Aviva or other competing products. *Id.* at 94:14-23.  His entire basis for concluding that other competitors, including Aviva, were harmed, was that consumers complained that they thought Manley's product would be larger, along with his general "understanding of how brands compete." *Id.* at 75:18-22.

Finally, Houston concluded that Manley consumers' post-decision dissatisfaction would drive those consumers away from the entire product class, harming Manley's competitors.  However, he acknowledged that along with disappointment regarding product size, consumers were also dissatisfied with the *quality* of Manley's product.  Houston Rep. 13.  In fact, he testified that dissatisfaction with quality was more likely to drive consumers away from subsequent purchases in the same product class.  Houston Dep. 71:18-23, 144:21-145:10.  His

34

conclusion that post-decision dissatisfaction with product *size* would result in lost future sales is unsupported by his own testimony and findings.

While an expert does not necessarily have to conduct quantitative testing, here there is no other factual basis for Houston's broad conclusions.  In the absence of identifiable factual bases, Houston appears to rely primarily on his experience and knowledge of consumer behavior theory.  While sometimes "observations and highly specialized expertise may suffice to form the basis of an expert opinion," *ADT Sec. Servs., Inc.*, 2011 WL 1084031, at *35, Houston must still "explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts," Fed. R. Evid. 702, advisory committee notes (2000 Amendments).  Houston, however, only provides conclusory statements.  For example, he "knows" more consumers would have reacted in the same way as those who complained on the internet, but he does not explain *how* he knows.  When "presented with only the experts' qualifications, their conclusions and their assurances of reliability," it is not enough.  *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995).  A court is not required "to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."  *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997).  Here, Houston's overall conclusions are "so fundamentally unsupported that [they] can offer no assistance to the jury."  *See Cole v. Homier Distrib. Co., Inc.*, 599 F.3d 856, 865 (8th Cir. 2010) (citations omitted).

After excluding Houston's specific conclusions, all that is left is essentially an academic lecture about the importance of visual information in marketing—that "[a] picture is an effective way to convey product information."  Houston Rep. 10.  "[W]here the subject matter is within

the knowledge or experience of lay people, expert testimony is superfluous." *Pelster v. Ray*, 987

F.2d 514, 526 (8th Cir. 1993) (citing *Ellis v. Miller Oil Purchasing Co.*, 738 F.2d 269, 270 (8th

Cir. 1984)). "Expert testimony is appropriate when it relates to 'issues that are beyond the ken of

people of ordinary experience.'" *United States v. Clapp*, 46 F.3d 795, 802 (8th Cir. 1995). An

expert's testimony that pictures are important and convey product characteristics such as "size,

shape, colors, and how the product can be enjoyed," Houston Rep. 10-11, does not assist the

jury. This is common sense and well within the knowledge or experience of lay people. For the

reasons stated above, the expert testimony of Dr. Michael Houston is excluded.

**D.  Dr. David Krauss**

Aviva retained Dr. David Krauss (Krauss) "to provide a scientific analysis of various

Manley Toys products and packaging to determine whether the images that appear on product

packaging misrepresent the actual product sizes." Krauss Rep. 1. Krauss is an expert in human

factors, human perception and performance, anthropometry,[18] safety, and risk analysis. He has a

BS in biopsychology and cognitive science and a PhD in cognitive neuroscience.

*1. Krauss's Study*

Krauss physically examined twenty-six Manley products and analyzed product packaging

images for thirty-six additional products. He did not analyze thirty-three of the ninety-five

products Aviva identified as falsely advertised. For the products he physically inspected, he

measured the dimensions of the products as they appeared on the packaging and compared those

to the actual dimensions of the product. He then used that comparison, or "scale factor," to

determine whether the children were appropriately scaled. He did this by measuring visible body

dimensions of the children on the product packaging, attempting to measure body parts in the

same plane of the photograph as the measured dimension of the product. He then applied the

---

[18] Anthropometry is the science of measuring sizes and ratios in the human body.

"scale factor" to extrapolate the size that the child's body dimension would actually be, if the photograph was not altered.  Krauss next estimated the age of the child in the image, and then using published anthropometric data, compared the extrapolated size of the child to the average size of a child of the estimated age (the "comparison ratio").  If the average size was much greater than the extrapolated size, he concluded that the child depicted on the packaging was smaller than the child is in real life, thus making the product look proportionally larger than it actually is.  To account for the inherent error in measurements of the products and images, as well as the variability in children's sizes, Krauss used the anthropometric data to determine at what point the comparison ratio reflected a likely alteration in the photo.  By comparing the sizes of the lowest 5th percentile for a particular age, gender and dimension of interest (meaning that 95% of the relevant population would be larger than that size), to the average size for that same age, gender, and dimension, Krauss arrived at comparison ratios ranging from 0.88 to 0.92.  To minimize the effect of measurement errors, Krauss adopted a comparison ration of 0.80, corresponding to the 0.1th or 0.01th percentile size for many of the dimensions examined.  Those product packages that produced comparison ratios of less than 0.80 were deemed to present images that depicted the products to be significantly larger than they actually were.

For the thirty-six products that Krauss did not physically examine, he obtained images from which he could perform some analysis.  He did not analyze images he deemed too small or too low resolution to permit reliable analysis.  He compared these products to other similar products that he did physically inspect, and categorized them into one of four groups: kiddie pools, medium pools, large pools, or slip-and-slides.  He then used for comparison the product dimensions of the actual product he physically examined—only utilizing product measurements where he had physical measurements of that dimension for at least three comparable products, or

the standard deviation between the measurements he obtained was less than three inches.  He then applied the same method as he did above, calculating a scale factor and then extrapolating the child's body size to arrive at a comparison ratio.

Krauss concluded that "[m]any of the Manley Toys product packages misrepresent the size of the products contained in the box by shrinking the children, relative to the products, who are shown in the promotional images."  Krauss Rep. 2.  Further, "[t]he magnitude of the differential scaling between the children and the products is such that young children (ages 5-10 years old) are often portrayed to be the size of toddlers or babies."  *Id.*  Specifically, he found that 74% of the packages contained at least one analysis that fell below the 0.80 comparison ratio.  He performed a total of 54 analyses, 59% of which did not meet the 0.80 criterion.

### 2.  *Qualification*

Manley argues that Krauss is not qualified to offer his proposed opinions because he has no experience with advertising or marketing and has never before used this approach to determine whether advertising images are distorted.  However, Krauss is an expert in the fields of human factors, human perception and performance, photogrammetry, and anthropometry.  He uses photogrammetry and/or anthropometry data in all his work, and has specialized knowledge in applying these principles and methods to image analysis.  Specialized knowledge in advertising or marketing is not required to render an opinion about the relative size of a child in a picture compared to the product in the same picture.  The Court finds that Krauss satisfies the qualification requirement for Federal Rule of Evidence 702.

### 3.  *Reliability*

Manley recites a litany of perceived flaws in Krauss's investigation, which Manley

claims render his opinion unreliable.[19]  Among these include assertions that Krauss used a

"novel" approach that has never been used before in a false advertising case and that his 0.80

"indicative of misrepresentation" criterion is arbitrary and not generally accepted in the scientific

community (i.e. the criterion has no support in literature and is not in any way linked to human

behavioral responses).  Def.'s Mem. Supp. Mot. Exclude Krauss 19.  Further, Manley argues that

Krauss used only an "eyeball test for (1) his approach to drawing lines on children's limbs to

make measurements; (2) his categorization of the 36 products he did not physically examine; (3)

whether product features were in the same plane of the photograph as the anthropometric

dimension; (4) whether an internet image was acceptable for analysis; and (5) whether a product

passed or failed his criterion when there were mixed results."  *Id*. at 20.  Manley further objects

that Krauss had no "objective criteria for how to take the measurements, which product features

to measure, and where to place the measuring devices."  *Id.* at 20-21.  Additionally, Manley

argues that Krauss failed to maintain a record of each step of his analysis; failed to evaluate the

effect that alternative factors, such as photograph quality, perspective, inflation of products, and

small sample size, influenced his conclusions; relied on an eyeball test to estimate the ages of the

children in the images, without any expertise in that area; inappropriately extrapolated data from

the twenty-six products he physically examined when analyzing the other thirty-six images;

failed to verify his assumptions by comparing his calculations with the dimensions provided on

the website; did not use a random sample of the entire population of products; did not use blind

or double-blind procedures; failed to determine a margin of error, and ignored internal

inconsistencies in his results.

---

[19] Manley also argues that Krauss's opinions are irrelevant because he analyzed only the product images, and not the advertisements as a whole.  While the jury must examine "the message conveyed within its full context" when determining that it is literally false, a jury could reasonably conclude that if the images misrepresent the size of the product, then the advertisement as a whole is literally false.  Krauss's analysis of the images is highly relevant to the issue of falsity.

Krauss's study basically involved measuring images of children and products on a box, measuring the actual products, and then, using basic arithmetic, determining what the actual size of the children would be if placed next to the actual products.  Krauss then determined whether that size was below the 5th percentile for a child of that approximate age.  While the specific application of photogrammetry and anthropometry in this precise context may be novel, the underlying principles and methods are not.  Photogrammetry is an accepted technique generally used for deriving measurements from photographs, and is heavily published and widely used in other areas.  Anthropometry has also been tested and reviewed, and is widely used.  Krauss applied these well-known techniques to a unique scenario—images of products in advertisements and packaging.  The novel application of accepted, published, reviewed, and tested techniques to a new set of facts does not make the analysis unreliable.

Manley's argument that the 0.80 "indicative of misrepresentation" criterion has no support in literature and is not in any way linked to human behavioral responses reveals Manley's misunderstanding of Krauss's analysis.  This criterion was not designed to determine whether the product advertisement constitutes false advertising or somehow affects consumer behavior.  Krauss's utilization of the 0.80 comparison ration was merely to conclude with some degree of statistical certainty that the images of children were reduced in size compared to the products.  If the comparison ratio for a particular image falls below 0.80, then according to Krauss's analysis, the size of the child in the image is less than that of a child in the 5th percentile for a child of the same estimated age.  For this purpose, it is irrelevant whether the 0.80 ratio is correlated with human perception or deception.

The Court also finds Manley's other objections to be without merit.  Krauss thoroughly detailed his methods, including the source for his anthropometric data and his criteria for making

measurements, categorizing products, and reducing errors due to inherent measurement error, poor photograph quality, parallax (or perspective), and age estimates.  He documented his measurements and calculations and retained the raw images from which he obtained those measurements.  Although he estimated certain data, such as the ages of the children, there is no evidence that such estimates were incorrect or unreliable.  Further, Manley's other criticisms are issues concerning the factual basis of his calculations and the errors in his measurements—issues well-suited for "[v]igorous cross-examination" and "presentation of contrary evidence." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993).  Additionally, Manley's argument that Krauss was biased goes again to the weight of the testimony, not its admissibility. *See, e.g.*, *DiCarlo v. Keller Ladders, Inc.*, 211 F.3d 465, 468 (8th Cir. 2000) (explaining that the expert's bias went to the weight of the testimony and the opposing party could present its evidence of bias on cross-examination).  The principles and methods Krauss used, and his application of those principles and methods to the facts, were sufficiently reliable.  Manley's motion to exclude Krauss's testimony is denied.

**E.  Frances McCloskey**

Aviva retained Frances McCloskey (McCloskey) to assess Aviva's damages and Manley's unjust enrichment resulting from Manley's alleged false advertising.  McCloskey is a co-founder, shareholder and Executive Vice President of Financial Advisors LLC.  She is a Certified Public Accountant and has BA in economics and an MBA in marketing.  She has over twenty-five years of financial, accounting, and consulting experience, including experience in providing expert assistance on litigation matters involving damages and profit analysis. McCloskey concluded that Aviva "suffered lost profits of at least $1.9 million as a result of Defendants' sale of falsely advertised inflatable water toys."  McCloskey Rep. 5.  She also

concluded that Manley "has been unjustly enriched by $89.5 million in gross profits as a result of its sale of falsely advertised inflatable toys." *Id.* Manley argues that McCloskey's damages and unjust enrichment analyses are unreliable. Further, Manley asserts that McCloskey's discussion regarding causation is beyond the scope of her expertise.

### 1. *Aviva's Damages*

Manley presents three challenges to McCloskey's analysis of Aviva's lost profits. It argues that McCloskey had "no basis" for: (1) Aviva's "assumed sales growth rate;" (2) Aviva's "assumed incremental profit margin;" and (3) her "assumption that any deviation from sales growth rate was due to false advertising." Def.s' Reply Mem. Supp. Mot. Exclude McCloskey 1.

First, Manley argues that McCloskey had "no basis" for Aviva's "assumed sales growth rate," because the "yardstick" to which she compared Aviva's pool and slide business was Aviva's non-pool and slide business—measures between which there was no correlation. A reliable forecast of Aviva's damages requires analysis of "comparable businesses in the area." *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 812 (N.D. Ill. 2005) (emphasis omitted). McCloskey explained that she chose Aviva's non-pool and slide business as a yardstick because it controlled for other factors that could have influenced Aviva's future sales, such as internal changes in Aviva's management and business as well as the economic downturn in 2008 and 2009. She further explained that Aviva's non-pool and slide business was in a similar market as its pool and slide business because "the majority of sales in the non-slide business were for inflatable toys or water toys which is the same market category as Aviva's slide business." McCloskey Decl. ¶ 7. Had McCloskey instead examined Aviva's "before" sales of pools and slides and compared it to Aviva's "after" sales, she would have arrived at a larger damages calculation because Aviva's pools and slides had performed much better than Aviva's

other products in the marketplace. For example, from 2002 to 2003, Aviva's non-slide sales increased by 27.2% while slide sales increased by 148%. From 2003 to 2004, Aviva's non-slide sales *decreased* by 1.9% while slide sales *increased* by 207.3%. McCloskey opted to use the more conservative measure so as to avoid overestimating Aviva's lost sales. Further, Manley has not suggested what a more appropriate yardstick might have been. It would have been pointless to analyze other businesses in the inflatable pool and slide market, since they all would have been negatively affected by Manley's allegedly false advertising and possibly suffered a loss of sales to Manley. The Court does not find McCloskey's choice of a "yardstick" to be fundamentally unreliable.

Manley next argues that McCloskey based her determination of Aviva's incremental profit margin on "incomplete financial data and an unsupported guess by an Aviva employee with no accounting or financial responsibility," rather than on "the detailed financial statements produced by Aviva." Def.s' Mem. Supp. Mot. Exclude McCloskey 21. McCloskey relied upon financial data, authenticated by Aviva's Chief Operating Officer, that comprised seventy percent of the sixty months being analyzed. Based on her experience as a forensic accountant, she determined that the quantity of data was sufficient to determine Aviva's incremental profit margin. Manley also objects to McCloskey's use of an annual gross profit margin for all the products cumulatively instead of on a product-by-product basis. McCloskey used a weighted average profit margin, which takes differing product profitability into account. This is not unreasonable. Additionally, Manley challenges McCloskey's 5% estimate for "commissions/warehousing/other variable costs." McCloskey relied on the testimony of Denise Reape, Aviva's Director of Sales and an employee since 2007. Reape was in a position to know Aviva's incremental costs and there is no evidence that she was an inappropriate source for

information regarding the historical and current costs of business activities within her area of responsibility. McCloskey stated that she independently verified the selling-related incremental costs based on Aviva's detailed 2007-2010 financial statements, confirming that Reape's information was "reasonable and reliable." McCloskey has a reasonable basis for relying on the information provided by Reape.

Finally, Manley challenges McCloskey's basis for concluding that any lost sales were due to Manley's allegedly false advertising. As previously discussed, Aviva has presented no evidence, through McCloskey or otherwise, that its lost sales were caused by Manley's allegedly false advertising. McCloskey's "evidence" of causation is: (1) Aviva's lost Target sales to Manley; (2) Poret's consumer survey results showing that some consumers would have purchased an Aviva product rather than a Manley product without Manley's allegedly false advertising; (3) Aviva's declining sales after Manley entered the market; (4) Manley's increasing sales after its entry into the market; and (5) Aviva's lost opportunity to enter the constant-air slide market (which she characterizes as a loss of goodwill because Aviva "was not able to develop as many sales and consumer impressions of its own brand" because it was "crowded" out of the market). There is no evidence that the loss of Target as a consumer, Aviva's declining sales, Manley's increasing sales, or Aviva's failure to enter the constant-air market were caused by Manley's allegedly false advertising. McCloskey's comparison to Aviva's non-pool and slide business may have effectively controlled for internal changes at Aviva and external economic pressures. However, there were many other factors she did not consider that might impact sales growth rates, such as product pricing, competitor behavior, and consumer demand. McCloskey Dep. 152:7-18.[20] Further, Poret's consumer study revealed that even when consumers were

---

[20] The Court also notes that McCloskey did not account for the entry of at least three other competitors—Intex, Wham-O, and Little Tikes—when calculating Aviva's damages. Aviva states that it occupied the entire market in

presented with an "accurate" image of Manley's product, some percentage of consumers still chose Manley's product over Aviva's competing product. McCloskey does not account for sales that would have been lost to Manley, even without allegedly false advertising. With no evidence linking Aviva's lost sales to Manley's allegedly false advertising, McCloskey's testimony regarding monetary damages is inadmissible.

### 2.  *Manley's Profits*

McCloskey also calculated Manley's alleged unjust enrichment—i.e. Manley's profits resulting from the false advertising. Manley argues that McCloskey: (1) failed to limit her analysis to sales of falsely advertised products; (2) failed to determine the portion of Manley's sales that were the result of false advertising; and (3) had no basis for her calculation of Manley's profit margins.

Manley argues that McCloskey's analysis included sales of products that are not accused of being falsely advertised. Manley identifies nine products that were included in McCloskey's analysis that were not included on Aviva's list of ninety-five accused products. McCloskey acknowledged during her deposition that it is possible that one or two of the products were inadvertently included, but the inclusion of those products had little effect on the overall calculation. Aviva maintains that the other products Manley identified *were* among the 95 accused products, marketed under different names. Manley contends that the products are actually different—with different colors, model numbers, design patterns, and sometimes different sizes. The only evidence that these products are different is the declaration of Ming Au, Manley's Marketing Manager, which generally states that the products are different in size, but does not provide any additional information or details regarding these differences. Overall,

---

2001, but it appears that at least these three competitors, in addition to Manley, have since entered the market for inflatable pools and slides. McCloskey's analysis does not appear to consider the influence these other competitors might have had on Aviva's sales.

whether these products are the same or different is a fact dispute for the jury to decide.  Further, if the jury concludes that these nine products were *not* among the ninety-five accused products Aviva identified, the Court does not find this error to be so significant as to render McCloskey's entire testimony inadmissible.

The Court also rejects Manley's argument that McCloskey inappropriately included in her analysis sales of products that did not pass Krauss's 0.80 criterion, which he identified as the threshold for "indicative of misrepresentation."  As previously explained, this 0.80 criterion was used for purposes of establishing statistical significance—at no point did Krauss conclude that products that did not pass the 0.80 criterion were *not* misrepresented.  For example, according to Krauss's study, if an image involved a comparison ratio of 0.90, then the child portrayed in the image would be 90% of the size of the average child of the same age, as estimated by Krauss.  This could still represent misrepresentation—just to a lesser degree and with greater uncertainty.

Manley argues that McCloskey erroneously relied on a report provided by Aquawood to determine the sales (and Manley's gross profit margin on those sales) of Manley products to non-big-box "other" retailers.  Manley argues that this was erroneous because McCloskey assumed that the report reflected only sales of Manley products, that the sales of Manley products to those retailers mirrors its sales to big-box retailers, and that Manley's gross profit margin on those sales would match its gross profit margin for sales to big-box retailers.  However, Manley presents no evidence that McCloskey's assumptions were wrong—there is nothing in the record indicating that Aquawood's report reflected sales of anything other than Manley's products.  Further, McCloskey had some basis for her estimates—she based them on the data she had regarding the big-box retailers.  Manley can challenge these factual bases on cross-examination.

However, the Court does find that McCloskey's analysis of sales of Manley's constant-air products is inadmissible.  As previously explained, Aviva does not compete with Manley in the constant-air market, and the Court finds no reliable evidence that Aviva would have entered that market but for Manley's allegedly false advertising.

Manley next argues that McCloskey did not account for Manley's sales that were *not* due to the allegedly false advertising.  McCloskey simply multiplied the total amount of sales by the gross profit level.  McCloskey Dep. 190:2-191:13.  As previously explained, it is the *defendant's* burden to apportion the sales not due to the allegedly false advertising.  The plaintiff must only prove sales of the violative products.  *See* 15 U.S.C. § 1117(a) ("In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed.").  For the same reason, even if McCloskey applied an incorrect gross profit margin, Aviva did not have to calculate profits at all—it only had to put forth evidence of sales.[21]

For the reasons stated above, McCloskey's opinions regarding Manley's profits and unjust enrichment are admissible.  However, the Court may entertain objections to the scope of her testimony at trial.

**F.  Manley's Rebuttal Experts**

Manley retained the expert services of Thomas J. Maronick (Maronick), Dr. Robert C. Sugarman (Sugarman), Dr. Larry Chiagouris (Chiagouris),[22] and Sidney P. Blum (Blum), to rebut the expert testimony of Hal Poret, Dr. David A. Krauss, Dr. Michael J. Houston, and Frances McCloskey, respectively.  Aviva moves to exclude Manley's experts because they "merely criticize" Aviva's experts' opinions "without providing any substantive opinions, and

---

[21] Manley argues that McCloskey inappropriately "assumed" a gross profit margin of 30%.  The Court finds that McCloskey's profits calculation was not fundamentally unsupported.  She had a sufficient factual basis, which Manley can thoroughly explore on cross-examination.

[22] Aviva's motion to exclude Chiagouris is moot, given the Court's exclusion of Aviva's expert Dr. Michael Houston.

therefore will result in cumulative testimony to that of the cross-examination of Plaintiff's expert witnesses." Aviva does not challenge the experts' qualifications. Instead, Aviva asserts that the experts' opinions are speculative and irrelevant under Rule 702 and cumulative under Rule 403.

Maronick prepared a report to "critically evaluate" Poret's consumer survey. He opined that it did not meet generally accepted standards for valid and reliable experimental research and was unreliable. Sugarman analyzed Krauss's procedures, results, and conclusions. He determined that Krauss used inadequate data and unreliable methods, concluding that Krauss's investigation did not meet the standards for generally acceptable scientific methods and principles. Blum evaluated McCloskey's conclusions regarding lost profits and unjust enrichment. He concluded that McCloskey's opinions were unreliable, inaccurate, overstated, speculative, and contained improper assumptions and errors.

### 1. Rule 702

Aviva argues that Manley's rebuttal experts fail to satisfy Rule 702's requirement that expert witnesses apply reliable principles and methods to the facts of the case. Specifically, by only criticizing Aviva's experts and performing no analysis of their own, Aviva argues that these experts do not identify any reliable principles or methods nor do they apply such principles or methods to the facts of the case—they merely identify flaws without establishing whether any of those flaws would have provided different results. Aviva cites *Advanced Telemedia, L.L.C. v. Charter Communications, Inc.*, No. 1:05-CV-2662-RLV, 2008 WL 6808442, at *1 (N.D. Ga. July 17, 2008), a case in which the court excluded a rebuttal expert where the expert merely identified flaws in the plaintiff's expert's method, without performing any testing or testifying that a different method would yield different results. The court concluded that the rebuttal

expert's testimony was speculative and prejudicial and would not assist the jury in determining damages. *Id.*

Manley responds by arguing that its experts' opinions will assist the trier of fact in understanding the evidence and determining facts in issue. "The function of rebuttal testimony is to explain, repel, counteract or disprove evidence of the adverse party." *Marmo*, 457 F.3d at 759 (citation omitted). A number of other district courts have held that rebuttal expert witnesses may criticize other experts' theories and calculations without offering alternatives. *See, e.g.*, *Coquina Invs. v. Rothstein*, No. 10-60786-Civ., 2011 WL 4949191, at *5 (S.D. Fla. Oct. 18, 2011) ("A rebuttal expert can testify as to the flaws that she believe[s] are inherent in another expert's report that implicitly assumes or ignores certain facts." (citation omitted); *Pandora Jewelers 1995, Inc.*, 2011 WL 2295269, at *6 (admitting a rebuttal expert who "merely provides other factors that [the plaintiff's expert] should have considered in his report, based on her economics expertise," explaining that "[h]ighlighting such factors will be helpful for the jury to weigh the evidence presented at trial."); *1st Source Bank v. First Res. Fed. Credit Union*, 167 F.R.D. 61, 65 (N.D. Ind. 1996) (allowing a rebuttal expert witness to criticize the plaintiff's damages theories and calculations without offering any alternatives); *Deutsch v. Novartis Pharm. Corp.*, 768 F. Supp. 2d 420, 481 (E.D.N.Y. 2011) (refusing to exclude rebuttal experts who focused on the reliability of plaintiff's expert's conclusions); *In re Cessna 208 Series Aircraft Prods. Liab. Litig.*, MDL No. 1721, 2009 WL 1649773, at *1 (D. Kan. June 9, 2009) (admitting rebuttal experts who "primarily critique[d] the methodology and scientific principles which plaintiffs' experts use[d] to arrive at their conclusions" and stating that "[s]uch evidence, which attacks the opposing expert's substantive testimony, is proper rebuttal"). "Contrary to plaintiffs' suggestion, a rebuttal expert who critiques another expert's theories or conclusions need not offer his own

independent theories or conclusions (though of course his testimony may be more persuasive if he does so)." *In re Cessna*, 2009 WL 1649773, at *1.

It is the proper role of rebuttal experts to critique plaintiffs' expert's methodologies and point out potential flaws in the plaintiff's experts' reports. The Court finds that Manley's rebuttal experts sufficiently applied their expertise to the facts and methodologies used by each of Aviva's experts in forming their conclusions. Thus, their testimony is not unduly speculative. These experts' testimony will be helpful for the jury to weigh the evidence presented at trial. Aviva's Motion to Exclude under Rule 702 is denied.

### 2. *Rule 403*

Under Rule 403 of the Federal Rules of Evidence, a court may exclude evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Aviva argues that the testimony of Manley's experts would be unfairly prejudicial and cumulative. As stated above, this Court does not find that Manley's experts' testimony is purely speculative or inherently misleading. The experts applied their expertise to the facts and properly criticized the methodologies and conclusions of Aviva's experts. Further, the Court cannot conclude at this time that these experts' testimony would be cumulative to the cross-examination of Aviva's expert witnesses. Whether the testimony would be cumulative depends on the evidence elicited during trial.

IV.    CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT

IS ORDERED THAT:

1.  Manley's Motion for Summary Judgment [Docket No. 425] is GRANTED IN PART and
    DENIED IN PART.

2.  Summary judgment in favor of Manley is GRANTED as to Aviva's recovery of actual
    damages, but is DENIED in all other respects.

3.  Manley's Motion to Exclude the Expert Testimony of Hal Poret [Docket No. 433] is
    DENIED.

4.  Manley's Motion to Exclude the Expert Testimony of Dr. Michael J. Houston [Docket No.
    431] is GRANTED.

5.  Manley's Motion to Exclude the Expert Testimony of Dr. David A. Krauss [Docket No. 440]
    is DENIED.

6.  Manley's Motion to Exclude the Expert Testimony of Frances McCloskey [Docket No. 438]
    is GRANTED IN PART and DENIED IN PART.

7.  Manley's Motion to Exclude the Expert Testimony of Frances McCloskey is GRANTED as
    to McCloskey's opinions regarding Aviva's monetary damages, but is DENIED as to
    McCloskey's opinions regarding Manley's profits.

8.  Aviva's Motion to Exclude the Expert Testimony of Manley's Rebuttal Experts [Docket No.
    436] is DENIED.


Dated:  November 8, 2011

s/  Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge