UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Aviva Sports, Inc.,

Plaintiff,

v.                                                          Civil No. 09-1091 (JNE/JSM)
                                                            ORDER
Fingerhut Direct Marketing, Inc., Menard, Inc.,
Kmart Corporation, Wal-Mart Stores, Inc., and
Manley Toys, Ltd.,

Defendants.

Plaintiff Aviva Sports, Inc. (Aviva) brought this action against Defendants Fingerhut

Direct Marketing, Inc. (Fingerhut), Menard, Inc. (Menard), Kmart Corporation (Kmart), Wal-

Mart Stores, Inc. (Wal-Mart), and Manley Toys, Ltd. (Manley), asserting claims of patent

infringement and false advertising.  The case is before the Court to construe disputed patent

claim terms pursuant to *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996).[1]

## I.    BACKGROUND

The patent at issue in this litigation, U.S. Patent No. 6,558,264 (filed Nov. 3, 2001), is

entitled "Inflatable Wedge for Diving onto a Water Slide."  The invention disclosed in the '264

Patent is an inflatable water play structure that connects to the end of a garden hose.  The body of

the structure is generally wedge-shaped, to permit a user to slide from the top end to the bottom

end of the structure.  The structure also includes a water emitting device, which discharges water

so as to lubricate the sliding surface of the structure.

As described in the specification, the inflatable wedge allows adults to safely use an

already-marketed product known as a Slip 'N Slide™ (confusingly referred to as a "water slide"

---

[1]    Defendants Fingerhut, Menard, Kmart, and Manley, represented by the same counsel,
presented the same claim construction arguments.  For purposes of this Order, these Defendants
will be collectively referred to as "the Manley Defendants."

in the patent).[2]  A Slip 'N Slide™ generally consists of a sheet of plastic that lies flat on the

ground and is lubricated by water.  Participants use the product by running toward one end of the

plastic sheet, and then transitioning from running to sliding on the sheet.  The specification of the

'264 Patent notes the inherent dangers of using a Slip 'N Slide™—primarily the transition from

running to sliding.  Because these dangers are more pronounced for adults, who are taller and

often less flexible than children, products marketed as Slip 'N Slides™ are generally not

intended for adult use.  According to the specification, the "inflatable wedge" of the '264 Patent

allows adults to participate in this activity by easing the transition from running to sliding.

Aviva alleges infringement of claims 14, 18, and 19 of the '264 Patent, and the

Defendants request construction of various terms found in claims 11, 14 and 18.[3]  Claim 14

depends from claim 11, which recites:

> 11. A water play structure for connection to an end of a garden hose,
> comprising a cushioning slide having a wedge-shaped inflatable body with a
> bottom surface to rest on a support surface, a downwardly sloped upper surface
> along which a user can slide from a top end to a bottom end thereof, a plurality of
> generally vertically disposed baffles which interconnect the base to the upper
> surface to retain the inflatable body in a wedge shape, and a water emitting device
> connectable to the garden hose for discharging water at the top end of said upper
> surface to flow down to said bottom end of said upper surface to lubricate said
> upper surface during sliding of the user therealong.

---

[2]     The '264 Patent also claims a design for a "water slide," but these claims are not at issue
in this litigation.  To avoid confusion, the Court will refer to the "water slide"—as the term is
used in the '264 Patent—as a Slip 'N Slide™.  The "inflatable wedge" of the '264 Patent serves
the function of what one ordinarily thinks of as a traditional "water slide"—a sloped surface
down which a user slides.

[3]     Manley filed a reexamination request with the U.S. Patent and Trademark Office
(USPTO) on February 19, 2010.  During the reexamination process, patent owner Aviva
cancelled claims 1-12 and 15-17.  Claim 14, which depends from (cancelled) claim 11, was
found patentable.  There is nothing in the record to indicate that claim 14 was ever rewritten in
independent form.  Thus, the parties, while stating they want to construe language in claim 14,
actually request construction of language found in claim 11.  During the reexamination process,
the USPTO also found new claims 18 and 19 to be patentable.

Claim 14 recites:

> 14. The water play structure according to claim 11, wherein respective side baffles of the plurality of baffles, and respective sides of the inflatable body are slightly taller than a remaining plurality of said plurality of baffles, such that the upper surface comprises a pair of side rails with a sliding surface therebetween.

Claim 18 recites:

> 18. A ground supported water play structure for connection to an end of a garden hose, comprising a cushioning slide having a wedge-shaped inflatable body with a bottom surface to rest on a support surface comprising the ground, a downwardly sloped upper surface having a sliding portion along which a user can slide from a top end to a bottom end thereof, and a water emitting device connectable to the garden hose for discharging water at the top end of said upper surface to flow down to said bottom end of said upper surface to lubricate said upper surface during sliding of the user therealong, wherein the wedge-shaped inflatable body further has a plurality of substantially vertical walls comprising a front wall, a pair of laterally spaced side walls and a rear wall that connect the bottom surface and the upper surface together, wherein the rear wall is substantially taller than the front wall and each side wall has a wedge shape to provide the wedge-shape of the inflatable body, wherein the rear wall when viewed in a rear elevational view of the wedge-shaped body has a sliding portion approach area thereon extending upwardly from the bottom surface to the top end of the upper surface and extending laterally from one side of the sliding portion of the upper surface to an opposite side of the sliding portion of the upper surface, wherein the inflatable body when inflated is free standing and self-supporting on the ground with the entirety of the sliding portion approach area of the rear wall being substantially completely exposed to a user, and wherein no portion of the water play structure is located behind the rear wall in a position that is within the sliding portion approach area of the rear wall such that a user who runs on the ground straight ahead towards the sliding portion approach area of the rear wall of the inflatable body has unimpeded access to the sliding portion approach area of the rear wall from the ground and is able to come up to the sliding portion approach area of the rear wall while running on the ground to transition directly from a running position on the ground immediately behind the sliding portion approach area of the rear wall to a sliding position atop the sliding portion of the upper surface without having to first step over or climb up any other portion of the water play structure.

## II.    DISCUSSION

The construction of patent claims "is a matter of law exclusively for the court."

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc), *aff'd*,

517 U.S. 370 (1996).  "[T]he claims of a patent define the invention to which the patentee is entitled the right to exclude."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (internal quotation marks omitted).  Words of a claim are generally given their ordinary and customary meaning, which is the meaning that the term would have to a person of ordinary skill in the pertinent art at the time of the invention.  *Id.* at 1312-13.  "[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."  *Id.* at 1313.  Because the meaning of a claim term as understood by persons of skill in the art is often not immediately apparent, a court should look to the sources available to the public that show what a person of skill in the art would have understood the claim language to mean.  *Id.* at 1314.  "Those sources include 'the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.'"  *Id.* (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004)).

The claims provide substantial guidance as to the meaning of particular claim terms.  *Id.* In some cases, the use of a term within the claim provides a firm basis for construing the term. *Id.*  Other claims of the patent can be valuable sources of enlightenment as to the meaning of a claim term.  *Id.*  "Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims." *Id.*  In addition, differences between claims can help determine the meaning of particular claim terms.  *Id.*  For example, a dependent claim that adds a particular limitation creates a presumption that the limitation is not present in the independent claim.  *Id.* at 1314-15.

The claims do not stand alone, however, and "must be read in view of the specification, of which they are a part." *Id.* at 1315 (internal quotation marks omitted). The specification is "always highly relevant" to claim construction and usually is dispositive because it is "the single best guide to the meaning of a disputed term." *Id.* (internal quotation marks omitted).

In addition to the claims and specification, a court should consider the patent's prosecution history, if it is in evidence. *Id.* at 1317. The prosecution history can "inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*

Finally, a court may consider extrinsic evidence, which is "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Id.* (internal quotation marks omitted). Extrinsic evidence, however, is less significant than the intrinsic record in claim construction. *Id.*

The Manley Defendants ask the Court to construe the following terms in claims 11, 14 and 18: "cushioning slide having a wedge-shaped inflatable body," "water emitting device connectable to the garden hose for discharging water at the top end of said upper surface," "vertically disposed baffles which interconnect the base to the upper surface to retain the inflatable body in a wedge shape," "side baffles," and "respective sides." Wal-Mart asks the Court to construe the following terms: "wedge shaped inflatable body," "for discharging water at the top end of said upper surface," and "baffles." Wal-Mart further argues that the terms "slightly taller" in claim 14 and "substantially taller" in claim 18 are indefinite pursuant to 35 U.S.C. § 112. Aviva asserts that no claim terms require construction. Because there is

significant overlap between many of the Manley Defendants' and Wal-Mart's proposed claim constructions, the arguments will be addressed together where applicable.

**A. "Cushioning slide having a wedge-shaped inflatable body" (Manley Defendants) and "wedge shaped inflatable body" (Wal-Mart)**

Claims 11 and 18 recite a "water play structure for connection to an end of a garden hose, comprising a cushioning slide having a wedge-shaped inflatable body with a bottom surface to rest on a support surface" and "a downwardly sloped upper surface" along which a user can slide from the top end to the bottom end. The Manley Defendants assert that "cushioning slide having a wedge-shaped inflatable body" means "an inflatable body having essentially flat (not curved) side walls each shaped essentially like a triangle (but possibly with a vertical front wall instead of a point) and an essentially flat (not curved) inclined upper surface connecting the top edges of the sides, the inflatable body sized to allow users to run and approach the highest side of the inclined upper surface and transition into a dive onto the inclined upper surface." Wal-Mart asserts that "wedge shaped inflatable body" means "inflatable body with an inclined upper surface that allows a participant to run toward the highest side of the inclined upper surface, and without slowing down jump and/or fall forward onto the inclined surface." Aviva asserts that no construction of these phrases is necessary.

The Manley Defendants and Wal-Mart both urge the Court to import a size limitation from the specification into the claims—the Manley Defendants argue that the Court should do so in construing the word "cushioning," and Wal-Mart asserts that the Court should import such a limitation through the word "wedge." Addressing the term "wedge" first, the Court sees no reason to construe the claim term "wedge" to limit the patent claims to wedges of only a particular size. "Wedge" describes the shape of the patented invention—not the size. Nowhere

in the specification or prosecution history is a "wedge" defined as being of a particular size.

"Absent a clear disavowal or contrary definition in the specification or the prosecution history,

the patentee is entitled to the full scope of its claim language." *Home Diagnostics, Inc. v.*

*LifeScan, Inc.*, 381 F.3d 1352, 1358 (Fed. Cir. 2004).  Nor is the word "wedge" unclear to a

person of ordinary skill in the art.  An ordinary person, and particularly a person of ordinary skill

in the art of water slides, is familiar with what a wedge is.  The Manley Defendants' attempt to

define "wedge" as being a precise planar shape with no curvature is unavailing, especially given

that the patent at issue involves a soft, inflatable structure, which by its very nature will have

some curvature.

     The Manley Defendants argue that the Court should construe the phrase "cushioning

slide" to mean a slide that is sized so that a user could "run and approach the highest side of the

inclined upper surface and transition into a dive onto the inclined upper surface."  Similarly,

Wal-Mart asserts that the slide disclosed in the '264 Patent is a slide sized such that a user could

run toward it, "and without slowing down jump and/or fall forward onto the inclined surface."

Basically, the Defendants ask the Court to limit claim 11 so that it does not read on very large

slides, such as slides that a user would have to first climb up before being able to slide down.

     The Defendants rely on the apparent purpose behind the invention disclosed in the '264

Patent, which was to provide a safe way for adults to use a Slip 'N Slide™.  This concept is

discussed several times throughout the '264 Patent.  For example, the title of the patented

invention is "Inflatable Wedge for Diving onto a Water Slide."  The Abstract notes that

participants can "run and dive onto the inflatable wedge which cushions their transition from a

vertical running position to a horizontal sliding position down the wedge."  The Background

section discusses the dangers of using a Slip 'N Slide™, and the written description states that

the inflatable wedge "makes it possible . . . for adults and children over 12 years old" to use a Slip 'N Slide™. Because participants can transition from a vertical to horizontal position "without initially coming into contact with the hard ground," "the danger of injury to the participants is substantially reduced due to the air cushioning effect" of the inflatable wedge.

Looking first at the language of the claims themselves, claim 11 states only that the "cushioning slide having a wedge-shaped inflatable body" has a "bottom surface to rest on a support surface" and "a downwardly sloped upper surface along which a user can slide from a top end to a bottom end thereof." The claim does not include any limitation that the inflatable body must be sized such that a user can jump, fall forward, or dive onto it from a running position on the ground. In contrast, claim 18 discloses a cushioning slide "with a bottom surface to rest on a support surface comprising the ground," and provides that "no portion of the water play structure is located behind the rear wall . . . such that a user who runs on the ground straight ahead towards the . . . rear wall . . . has unimpeded access" and can "come up to the sliding portion approach area of the rear wall while running on the ground to transition directly from a running position on the ground immediately behind the sliding portion approach area of the rear wall to a sliding position atop the sliding portion of the upper surface." When the patent owner added claim 18 during the reexamination process, it explained that claim 18 was a narrower claim because it defined the support surface for the inflatable wedge as the ground. Nickels Decl. Ex. F, at 20. If the "support surface" in claim 11 is not limited to being the ground, then the inflatable wedge recited in claim 11 cannot be one that requires a user to approach it by running upon the ground. Further, claim 18 explicitly provides that the user is able to come up to the sliding portion of the structure "while running on the ground" and "transition directly from a running position on the ground . . . to a sliding position atop the sliding portion of the upper

surface without having to first step over or climb up any other portion of the water play structure."  If the phrase "cushioning slide having a wedge-shaped inflatable body" as used in both claims 11 and 18 already contained this size and function limitation, then the lengthy recitation of limitations in claim 18 following the disputed claim term would be rendered superfluous.  Such a construction is disfavored.  *Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*, 671 F.3d 1270, 1275 (Fed. Cir. 2012) (stating that a construction which renders claim language superfluous "is contrary to the well-established rule that 'claims are interpreted with an eye toward giving effect to all terms in the claim'" (citation omitted)).  Thus, it is apparent that claim 18, which is narrower than claim 11, contains a size limitation that requires users to be able to approach the slide from a running position on the ground.  It is equally apparent that claim 11 does not contain this explicit limitation.

Defendants argue that the specification only describes embodiments that involve running on the ground toward the wedge and jumping and/or falling forward onto the wedge.  But "although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments."  *Phillips*, 415 F.3d at 1323; *see also Nazomi Commc'ns, Inc. v. ARM Holdings, PLC*, 403 F.3d 1364, 1369 (Fed. Cir. 2005) (noting that claims may embrace "different subject matter than is illustrated in the specific embodiments in the specification").  "In particular, we have expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment."  *Phillips*, 415 F.3d at 1323.  Where the specification describes only a single embodiment, the claims will be read restrictively only if "the patentee has demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction.'"  *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir.

2004) (quoting *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002)). Here, there is no indication that the patentee intended to limit the claim scope to inflatable wedges of only particular sizes.  There are no "words or expressions of manifest exclusion or restriction" in either the written description or the prosecution history of the '264 Patent.  The patentee has not demonstrated a clear intent that "the claims and the embodiments in the specification . . . be strictly coextensive."  *See Phillips*, 415 F.3d at 1323.

The Court also finds no support for the Manley Defendants' argument that the patentee called the described embodiment "the present invention."  Contrary to the Manley Defendants' assertions, Figure 1 in the '264 Patent is merely a view "of *an* inflatable wedge according to the present invention" (emphasis added)—it is not a view of *the* inflatable wedge of the present invention.  Further, this figure does not include any dimensions or other size limitations.  The background section of the '264 Patent states that "[t]he present invention relates to inflatable water toys and slides, and more specifically to inflatable water toys for use with a water slide."  The summary of the invention states that "[t]he present invention is a water play structure which comprises a cushioning slide for connection to an end of a garden hose."  Nowhere in the specification is the illustrated wedge or described embodiment labeled the invention itself or the "present invention."  The illustrations and description merely provide an embodiment of the invention.

Defendants also focus heavily on the word "diving" in the title of the patented invention: "Inflatable Wedge for Diving onto a Water Slide."  They argue that the title confirms that a user must be able to dive onto the wedge itself.  But the title only indicates that a participant can use the inflatable wedge to dive onto the Slip 'N Slide™ (the term "water slide" as used in the '264 Patent actually refers to a Slip 'N Slide™, *not* the wedge down which users slide).  The title says

nothing regarding the manner in which the user gets onto the *wedge*.  Second, there is no

indication that "diving" requires running on the ground.  Although no definitions of "dive" were

provided by the parties, the Court notes that the Merriam-Webster Dictionary defines "dive" as

"to plunge into water intentionally and especially headfirst" or "submerge."  The Oxford

Dictionary defines "dive" as "plunge head first into water."  A user can plunge headfirst onto a

Slip 'N Slide™ without having to jump, fall forward, or dive onto the wedge.  For example, a

user could climb up a ladder and slide down the inflatable wedge headfirst, thus "diving" onto

the Slip 'N Slide™.  Defendants' reliance on the patent title is unavailing.

The central purpose of the patented invention was to enable adults to use a Slip 'N

Slide™ while minimizing the risk of injury.  One embodiment of the invention was a wedge

upon which users could jump and dive.  However, a very large slide upon which a user must first

climb does not frustrate the purpose of the invention.  In fact, such a slide might further the

inventive concept envisioned by the inventor.  A user could climb up a ladder and ease himself

onto the inflatable wedge, without having to run and jump at all.  If the wedge is of a sufficient

height, the user could slide down the wedge and gain sufficient speed to enable him to slip along

a Slip 'N Slide™.  Such a slide would also provide a "cushioning" effect—the slide itself would

be inflatable and non-rigid, it would ease the user's transition into a diving position, and it would

reduce the user's impact upon contacting the ground.  Removing the running and jumping

requirement of a traditional Slip 'N Slide™ enables an even wider group of users to participate

in the activity—the very problem the inventor of the '264 Patent sought to resolve.  The fact that

the invention "makes it possible" for adults to use a Slip 'N Slide™ by running and jumping

onto the inflatable wedge does not clearly disclaim a structure that lacks such benefits.  *See, e.g.*,

*I4I Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 844 (Fed. Cir. 2010) (holding that statements in

the specification such as "[t]he present invention provides the *ability* to work solely on metacodes," "[t]he process allows changes to be made," "[a] metacode map *could* be edited," and "a new map *can* be created" were merely "permissive language" that described the advantages of the invention and did "not clearly disclaim systems lacking these benefits" (emphasis in original)).

The only size limitation that can fairly be read into claim 11 is that the inflatable wedge must not be too small for a person to slide down it.  For example, a wedge standing only one inch tall would not suffice.  But the Court is not convinced that claim 11 is limited to a wedge small enough so that a user could run up to it on the ground and jump, fall forward, or dive onto it. Although the specification refers to users being able to use the wedge in such a manner, the language of claim 11 does not contain this limitation, nor did the patentee disclaim larger wedges.  The Court will not import a size limitation based upon an embodiment from the specification where there is no indication that the patentee intended the claims to be so limited. Even if the inflatable wedge in the '264 Patent were to be limited to only a wedge of a particular size, the parties have not identified any specific claim term that appropriately lends itself to such a construction.  Defendants' efforts to import a size limitation through the claim terms "wedge" and "cushioning" amount to an attempt to fit a square peg in a round hole.  Thus, the Court concludes that the claim terms "cushioning slide having a wedge-shaped inflatable body" and "wedge shaped inflatable body" require no construction.

**B.**  **"Water emitting device connectable to the garden hose for discharging water at the top end of said upper surface" (Manley Defendants) and "for discharging water at the top end of said upper surface" (Wal-Mart)**

Claims 11 and 18 recite a "water emitting device connectable to the garden hose for discharging water at the top end of said upper surface to flow down to said bottom end of said upper surface to lubricate said upper surface during sliding of the user therealong." The Manley Defendants request that the Court construe "water emitting device connectable to the garden hose for discharging water at the top end of said upper surface" to mean "a device connectable to a garden hose positioned to place water at, not merely near, the vertically highest end of the upper surface to lubricate the inclined upper surface to assist sliding." Wal-Mart requests that the Court construe "for discharging water at the top end of said upper surface" to mean "that places water at the vertically highest end of the upper surface." Aviva argues that no construction of these claim terms is necessary.



*The '264 Patent's Figure 1.*

The specification in the '264 Patent teaches two embodiments of the "water emitting device." First, the device could be comprised of a "plurality of water spray holes," demonstrated in the above figure as the holes labeled 95. Alternatively, the wedge could include a pair of clips (labeled 101) affixed to the side rails of the wedge, which fasten a garden hose to the wedge and

"direct water spray" from the hose "onto the sliding surface."  The vertically highest end of the

wedge is at the rear wall, as depicted in the above figure.  Both embodiments of the patented

invention envision the placement of water some distance *away* from the vertically highest point.

Courts generally should not adopt a claim interpretation that would exclude the disclosed

embodiment of an invention.  *See Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1276 (Fed. Cir. 2008)

("We normally do not interpret claim terms in a way that excludes embodiments disclosed in the

specification."); *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 327 F.3d 1364, 1369 (Fed. Cir. 2003)

(finding that the district court's claim construction erroneously excluded an embodiment

described in an example in the specification, where the prosecution history showed no such

disavowal of claim scope); *see also Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*, 616

F.3d 1283, 1290 (Fed. Cir. 2010) ("A claim construction that excludes the preferred embodiment

'is rarely, if ever, correct and would require highly persuasive evidentiary support.'" (citation

omitted)); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) (same).

There is, however, an exception where embodiments "are clearly disclaimed in the specification

or prosecution history," *Oatey*, 514 F.3d at 1277 (citations omitted); *see also Elekta Instrument

S.A. v. O.U.R. Scientific Int'l, Inc.*, 214 F.3d 1302, 1308 (Fed. Cir. 2000) (patentee amended the

claims during prosecution in such a way as to exclude the preferred embodiment), or where the

claim language is clear and other, unasserted claims *would* cover the excluded embodiments, *see*

*August Tech. Corp. v. Camtek, Ltd.*, 655 F.3d 1278, 1285 (Fed. Cir. 2011).  Neither of these

exceptions applies here.  The patentee did not disclaim the embodiments in either the

specification or prosecution history.  If the claims were construed such that the water emitting

device must discharge water at the vertically highest point, then none of the patent claims,

asserted or unasserted, would cover the excluded embodiments.

Moreover, the Defendants seemed to acknowledge during oral argument that in a case where the inflatable structure is a perfect wedge, with a sharp point at the vertically highest end, it would be nearly impossible to place water at the vertically highest point. Simple mechanics just does not permit it. The tube or hose carrying the water would presumably be of some thickness, and the vertically highest point of the wedge would not be able to fit such a tube. Although water could be placed very close to the vertically highest point, the Defendants accepted that there would still be some, even if minimal, distance between that highest point and the place where water is discharged.

Thus, the Court concludes that "at the top end" as recited in claims 11 and 18 does not necessarily mean at the vertically highest point. The water must be placed in such a position along the top end of the sliding surface as to sufficiently lubricate the sliding surface to permit a user to slide along it. A jury can easily determine whether the "water emitting device" of the accused infringing products fulfills this function. No construction of these claim terms is necessary.

## C.   "Vertically disposed baffles which interconnect the base to the upper surface to retain the inflatable body in a wedge shape" (Manley Defendants) and "baffles" (Wal-Mart)

Claim 11 recites "a plurality of generally vertically disposed baffles which interconnect the base to the upper surface to retain the inflatable body in a wedge shape." Additionally, claim 14 states that the "side baffles of the plurality of baffles . . . are slightly taller than a remaining plurality of said plurality of baffles, such that the upper surface comprises a pair of side rails with a sliding surface therebetween." The Manley Defendants argue that "vertically disposed baffles which interconnect the base to the upper surface to retain the inflatable body in a wedge shape" means "single-piece, flat structures completely inside the inflatable body that connect the base to

the upper surface to form a plurality of chambers to maintain a wedge shape of the inflatable body." Wal-Mart argues that "baffles" are "structures completely inside the wedge-shaped inflatable body that form a plurality of chambers inside the wedge-shaped inflatable body." Aviva again asserts that no claim construction is necessary.

Aviva argues that the baffles need not be entirely inside the inflatable body. It asserts that a partially-external structure can also be a "baffle." For example, Aviva argues that the raised "side baffles" that form the side rails can extend past the upper sliding surface, such that they are partially exposed to the air outside of the inflatable body. Aviva provides the following diagram to illustrate what it categorizes as the partially-external "side baffle":



In other words, what Aviva is calling a "side baffle" is represented by segment D in the following Court-generated diagram, with the internal portion labeled segment C and the external portion labeled segment B:



Claim 11 recites that the baffles must "interconnect the base to the upper surface to retain the inflatable body in a wedge shape." Thus, the claim provides that the baffles serve a specific structural purpose. As explained by the patent owner during the reexamination process, the baffles perform something akin to a spacing or tethering function, so that when the wedge is inflated, it maintains its wedge shape, rather than ballooning out in the center.

> The whole point of the baffles in the wedge-shaped inflatable body 23 of the 264 patent is to connect two spaced sheets of material together, namely the base 23 and the sloped upper surface 29 that inherently must be spaced apart from one another and that diverge from one another in order to form the wedge shape of the body. The baffles maintain body 23 in its wedge shape without the body simply ballooning up in the middle when inflated. . . . Inherently, the base and the upper surface must be spaced away from one another and the baffles must maintain that spacing "to retain the inflatable body in a wedge shape." In this sense, the baffles function as spacers but simply limit the spacing to a predetermined amount when the body is inflated so that the body retains the wedge shape.

Nickels Decl. Ex. F, at 15-16. Only segment C—not the entire segment D—performs this "spacer" function. The Court does not see how the partially external structure, as depicted by segment B, retains the wedge-shape of the inflatable body or prevents the body from "ballooning up in the middle when inflated." Based on this functional requirement, only segment C is a baffle.

The language of claim 11 also makes it clear that the baffles are structures distinct from the inflatable body itself. The baffles in the '264 Patent "interconnect the base to the upper surface to retain the inflatable body in a wedge shape." A plain reading of this language indicates that the baffles are something distinct from the "inflatable body." The "inflatable body" is comprised of surfaces that maintain its inflatable integrity—i.e., surfaces that if cut or punctured, would result in deflation of the body. The "baffles" do not perform the function of containing air within the body—rather, they give the body shape. Segment B in the Court-

17

generated diagram, or the "not internal" segment in Aviva's diagram, is an exterior surface that contains air, but does not provide shape to the body.

The reexamination history confirms this distinction between surfaces of the "inflatable body" and "baffles."  Below is a diagram from prior art reference U.S. Patent No. 6,312,341 (filed Mar. 15, 2000) ('341 Patent), which was discussed at length by the patent owner of the '264 Patent during the reexamination process.



*U.S. Patent No. 6,312,341 fig.2 (filed Mar. 15, 2000)*
*(as adapted in Nickels Decl. Ex. F, at 17)*

The patent owner explained that "[t]he Examiner cannot read the upper or lower semi-circular halves of the tubes 26, 28 as the baffles since this material is analogous only to the upper and bottom surfaces of the inflatable body."  Nickels Decl. Ex. F, at 18.  The "baffles" in the '341 Patent were the heat seals, which were "all the same size."  *Id.*  Segment B in the Court-generated diagram, or the "not internal" segment in Aviva's diagram, is analogous to a portion of the "upper . . . semi-circular hal[f]," which the patent owner clearly stated was not a "baffle," but was instead a "surface[] of the inflatable body."

All of the figures in the '264 Patent's specification show the baffles as being entirely internal to the inflatable body.  The figures illustrate how the raised side baffles and the non-raised middle baffles—all completely inside the inflatable body—connect the base to the upper surface and maintain the wedge shape of the inflatable body.   Although the claims generally need not be limited to the illustrated embodiment, here there is no other way for the baffles to

perform the structural function provided for in the claim.  In the figures below, the baffles are

labeled 44, 47, 50, 53, and 56:



The '264 Patent's Figure 7.

The '264 Patent's Figure 2 (as adapted in Nickels
Decl. Ex. F, at 13).

The reexamination history of the '264 Patent confirms that the baffles must be entirely

inside the inflatable body.  During the reexamination process, the patent owner distinguished the

invention from the prior art by explaining that the prior art wedge-shaped inflatable bodies did

not contain "any vertically disposed baffles *within* these bodies.  Nickels Decl. Ex. F, at 12.

> It is significant that in describing his invention the Applicant NEVER
> called any of the basic exterior walls of body 23 a "baffle."  He called them a
> base, an upper surface, a front wall, a rear wall, and side walls, but NEVER
> baffles.  Instead, he carefully applied the term baffles only to a plurality of
> laterally spaced members *in the interior of body* 23.

*Id.* at 13 (emphasis added).  The "side baffles" are simply the two outermost baffles in the baffle

array.  *Id.* at 14.  The patent owner again in July 2011 stated that "[a] plurality of baffles 44, 47,

50, 53, and 56 are used *within* body 23 for retaining the wedge shape of body 23."  Nickels Decl.

Ex. D, at 3 (emphasis added); *see also id.* at 10 (describing how the raised sides are created by

"increasing the height of the . . . *interior* side baffles" (emphasis added)).

Moreover, during reexamination, the patent owner distinguished the raised side baffles in

the '264 Patent from the "add-on tubes" taught in the prior art references.  Specifically, with

regard to claim 14, the patent owner disclaimed any structure in which the raised side rails of the inflatable wedge were created through the use of separate add-on tubes, rather than raised baffles. Nickels Decl. Ex. C, at 10-13. Two examples of prior art references from which the patent owner distinguished his invention are provided below:



U.S. Patent No. 6,312,341 fig.2          U.S. Patent No. 5,604,945 fig.8
(filed Mar. 15, 2000).                    (filed June 16, 1995).

The '341 Patent also related to a cushioning water slide, and taught larger diameter tubes 28 along the periphery of the slide to prevent the user from inadvertently sliding off the side of the slide. The '945 Patent taught an air mattress with interior baffles and raised sides formed by larger cylindrical add-on tubes.

The Court notes that if one were to inflate Aviva's illustrated figure with air, such that the segments became round rather than rectangular, Aviva's figure would look strikingly similar to figure 8 from the '945 Patent, which the patent owner explicitly disclaimed. Below is an example, using the Court-generated figure based on Aviva's illustration:



In essence, what Aviva illustrated in its diagram is, in fact, the add-on tubes that the patent owner disclaimed—they are merely rectangular rather than round. The "not internal" segment B is not a baffle, but is part of the surface of the add-on tube. Even if the partially-external structure could be considered a "baffle," the patent owner explicitly rejected that sort of structure. Based on the claim language, the specification, and the file history, the Court concludes that "baffles" as described in the '264 Patent are structures that are completely internal to the inflatable body.[4]

The Court, however, does not find it appropriate to add the limitations that the baffles be "single-piece, flat structures" or "form a plurality of chambers." First, there is no support in the patent claims, specification, or prosecution history for the assertion that the baffles must be single-piece, flat structures. Adopting such a construction would be a wholly inappropriate limitation of the claims. Second, claim 12—which was cancelled during the reexamination process, but had also depended from claim 11—recites: "The water play structure according to claim 11, wherein the baffles form a plurality of interconnected vertically disposed chambers which are fillable through an air valve affixed to the body." "Differences among claims can . . . be a useful guide in understanding the meaning of particular claim terms." *Phillips*, 415 F.3d at 1314. "For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1314-15. Thus, the doctrine of claim differentiation suggests that the limitation of "a plurality of . . . chambers" as recited in dependent claim 12 is not present in independent claim 11 (upon

---

[4]    At oral argument, counsel for Manley introduced the following analogy: Imagine a family of five (two adults and three children) who lined up side-to-side, with the children in the middle and the adults on either end. They then put a sheet over their heads and stood underneath the sheet. The adults are like the "side baffles," the children are like the "middle baffles," and the sheet is the "upper surface." At all times, the family member "baffles" are entirely underneath the sheet, unexposed to the outside air. So, too, with the "baffles" of the '264 Patent.

which claim 14 also depends).  The "baffles" as recited in claims 11 and 14 are not limited to baffles that form "a plurality of chambers."

In conclusion, the Court construes the claim term "vertically disposed baffles which interconnect the base to the upper surface to retain the inflatable body in a wedge shape" as follows: "vertically disposed baffles entirely inside the inflatable body that interconnect the base to the upper surface to retain the inflatable body in a wedge shape."

**D.  "Side baffles" and "respective sides" (Manley Defendants)**

Claim 14 recites: "The water play structure according to claim 11, wherein respective side baffles of the plurality of baffles, and respective sides of the inflatable body are slightly taller than a remaining plurality of said plurality of baffles, such that the upper surface comprises a pair of side rails with a sliding surface therebetween."  The Manley Defendants ask that the Court construe "side baffles" to mean "outermost vertically disposed baffles that are roughly parallel to the sides of the inflatable body, that are taller than the remaining plurality of vertically disposed baffles, and that are not formed in whole or in part by the add-on tubes or material originally separate from the baffle."  Because the claim already states that the baffles are "generally vertically disposed," it is not necessary to repeat that language as the Manley Defendants have proposed.  A juror will also understand from the claim language alone that the "side baffles" are the outermost baffles in the baffle array.[5]  The claim language also explicitly states that the side baffles are taller than the remaining baffles, so adding this language would be redundant.  Finally, because the Court has already determined that the "baffles" in the '264

---

[5]     The file history confirms that the "side baffles" are the outermost baffles.  *See, e.g.*, Nickels Decl. Ex. D, at 10 (describing the "side baffles" as the baffles adjacent to the side walls); Nickels Decl. Ex. F, at 13-14 (stating that the applicant "chose to describe the two baffles at the extreme sides of the baffle array as the 'side baffles'" and that "the 'side baffles' are the last and outermost baffles marking the extreme sides of the baffle array").

Patent are structures entirely inside the inflatable body, it is not necessary to add language

indicating that the "side baffles" are not formed by "add-on tubes or material originally separate

from the baffle."  Thus, the Court declines to adopt the Manley Defendants' construction and

finds that no construction of the claim term "side baffles" is necessary.

The Manley Defendants also ask the Court to construe "respective sides" to mean "sides

of the inflatable body that are taller than those vertically disposed baffles that are not side baffles

and in which the sides are the same length as the inclined upper surface of the inflatable body,

and that are not formed in whole or in part by add-on tubes or material originally separate from

the sides."  The claim language itself makes clear that the "side baffles" are distinct from the

"respective sides" and that both the "side baffles" and "respective sides" are taller than the

remaining baffles.  As stated above, it is not necessary to add the language regarding add-on

tubes or originally separate material—especially because this proposed addition seems to only

add more confusion.

The Manley Defendants' proposed construction for the claim terms "side baffles" and

"respective sides" does nothing more than add redundant language and make the claim language

more confusing, not less.  This particular claim language as it appears in claim 14 is clear and

requires no construction.

**E.  "Slightly taller" and "substantially taller" (Wal-Mart)**

Wal-Mart asserts that "slightly taller," as it appears in claim 14, and "substantially taller,"

as it appears in claim 18, are indefinite pursuant to 35 U.S.C. § 112 because they are insolubly

ambiguous and do not reasonably apprise a person of ordinary skill in the art of their scope.  "A

determination of claim indefiniteness is a legal conclusion that is drawn from the court's

performance of its duty as the construer of patent claims." *Datamize, LLC v. Plumtree Software,*

*Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005) (internal quotation marks omitted).  "Because the claims perform the fundamental function of delineating the scope of the invention, the purpose of the definiteness requirement is to ensure that the claims delineate the scope of the invention using language that adequately notifies the public of the patentee's right to exclude."  *Id.* (citations omitted).  "The definiteness requirement, however, does not compel absolute clarity. Only claims 'not amenable to construction' or 'insolubly ambiguous' are indefinite."  *Id.* (citations omitted).  "[A]n issued patent is entitled to a statutory presumption of validity," and "clear and convincing evidence [must] be shown to invalidate a patent."  *Id.*  Thus, a claim will avoid invalidity on indefiniteness grounds "[i]f the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree."  *Id.* (internal quotation marks omitted); *see also Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1249-50 (Fed. Cir. 2008) ("Proof of indefiniteness requires . . . an exacting standard," which "is met where an accused infringer shows by clear and convincing evidence that a skilled artisan could not discern the boundaries of the claim based on the claim language, the specification, and the prosecution history, as well as her knowledge of the relevant art area.").

The Court first notes that Wal-Mart has not put forth any evidence, let alone clear and convincing evidence, that a person of ordinary skill in the art could not discern the scope of the disputed claims.  Instead, Wal-Mart seems to be attempting to shirk its burden by "re-casting its invalidity argument as a claim construction issue."  *See 3M Co. v. Moldex-Metric, Inc.*, 552 F. Supp. 2d 921, 941 (D. Minn. 2008).  Wal-Mart cannot avoid its burden in this way—it must still provide clear and convincing evidence of invalidity.  However, the Court finds it unnecessary to delay ruling on the issue of claim definiteness.

"Slightly" and "substantially," as used in claims 14 and 18, are words of degree, and as such, the claims will be found invalid if there is no evidence, intrinsic or extrinsic, that provides some objective standard for measuring that degree. *See Datamize*, 417 F.3d 1342; *Seattle Box Co. v. Indus. Crating & Packing, Inc.*, 731 F.2d 818, 826 (Fed. Cir. 1984). The patent must provide one skilled in the art with enough direction "to determine the scope of the claimed invention," *Datamize*, 417 F.3d at 1352, even if doing so requires some experimentation, *see Seattle Box*, 731 F.2d at 826. A claim is not indefinite where intrinsic evidence "provides 'a general guideline and examples sufficient to enable a person of ordinary skill in the art to determine [the scope of the claims,]'" even where no precise measurements are provided. *Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1333, 1335 (Fed. Cir. 2010) (citation omitted). Further, when a patented invention comes in different sizes (or applies to structures of different sizes), variable dimensions need only be "as accurate as the subject matter permits," as long as a person of ordinary skill in the art could, with some experimentation, obtain those dimensions. *See Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1576 (Fed. Cir. 1986).

Claim 14 recites a water play structure where the "side baffles . . . and respective sides of the inflatable body are slightly taller" than the remaining baffles, "such that the upper surface comprises a pair of side rails with a sliding surface therebetween." The specification provides that the taller side rails function so as to "prevent users from inadvertently sliding off" the side of the wedge. '264 Patent col. 3 ll. 31-34. The file history also confirms that the "taller sides . . . prevent the user from falling off the side of the body while sliding down the upper surface." Nickels Decl. Ex. E, at 3. Because the inflatable wedge can come in various sizes, and can accommodate users of different sizes, the subject matter here does not permit precise dimensions for the side rails. But there is enough intrinsic evidence to provide a person of ordinary skill in

25

the art of water slide design with sufficient direction to determine the scope of claim 14, even if some experimentation is required—the side baffles and respective sides must be tall enough to form a pair of rails that prevent users from falling off the slide of the wedge.  The term "slightly taller" is not insolubly ambiguous, and claim 14 is not indefinite.

Claim 18 states that the rear wall of the wedge-shaped inflatable body must be "substantially taller than the front wall and each side wall has a wedge shape to provide the wedge-shape of the inflatable body."  The claim also discloses a water play structure with a "downwardly sloped upper surface having a sliding portion along which a user can slide from a top end to a bottom end."  The specification does not use the word "substantially," but it repeatedly describes the invention as an "inflatable wedge" or "wedge-shaped inflatable body."  For the structure to constitute a "wedge," one wall must be taller than its opposing wall.  All of the figures in the specification depict such a "wedge."  One of the embodiments in the patent is a wedge that is "approximately forty to fifty inches wide, six to nine feet long, and thirty to thirty-six inches high at one side, with the size being dependent on the size and age of the users, smaller for children and larger for adults."  '264 Patent col. 3 ll. 21-24.  The intrinsic evidence provides enough direction to a person of ordinary skill in the art to determine the scope of the claimed invention.  As explained above, because the invention may be made in various sizes and for users of different sizes, the subject matter here does not permit precise dimensions.  But with some experimentation, a person of ordinary skill in the art can determine whether the rear wall is sufficiently taller than the front wall so as to create a sloped sliding surface along which a person can slide from top to bottom.  There is no "clear and convincing evidence that a skilled artisan could not discern the boundaries of the claim" and so the claim is not insolubly ambiguous.  Claim 18 is not indefinite.

Because no party has moved for the construction of the claim terms "slightly taller" and "substantially taller," the Court declines to construe those terms as they appear in claims 14 and 18 of the '264 Patent.

### III.    CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT the disputed claim terms and phrases are construed as set forth in this Order.

Dated: July 18, 2012

s/  Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge