UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA


AVIVA SPORTS, INC.,                              CIV. NO. 09-1091(JNE/JSM)

       Plaintiff,                              REPORT AND RECOMMENDATION

v.

FINGERHUT DIRECT MARKETING, INC.
MENARD, INC., KMART CORP.
WAL-MART STORES, INC. and
MANLEY TOYS, LTD.

      The above matter came before the Court on plaintiff's Motion for Sanctions

[Docket No. 635]. Keith Sorge, Esq. appeared on plaintiff's behalf. Jonathan Wilson,

Esq. and Stephen Lobbin, Esq. appeared on behalf of defendant Manley Toys, Ltd.

      This Report and Recommendation is issued pursuant to Minn. Local Rule

72.2(b).

## I.    BACKGROUND

      This garden variety false advertising and patent infringement case, which began

in May of 2009, has in the intervening years become an unending battle by Aviva to

secure Manley's compliance with this Court's sanctions and discovery orders. What

has transpired should serve as a cautionary tale regarding the difficulties American

lawyers may face when working with clients who do not operate within a system of

jurisprudence that approximates the American system and who apparently have no fear

about disregarding court orders.[1] From the document production dispute that triggered

---

[1]    See, e.g., Dan Harris, Chinese Companies Court Disaster, Wall Street Journal,
August 18, 2010:

the first of several court orders that Manley has ignored to the present, it has become

abundantly clear to this Court that Manley's many American lawyers,[2] have had little or

no control or influence over their client.

> [C]hinese companies are especially prone to making big mistakes that spring from their failure to learn even basic principles about an American system that is very different from what they have at home.  For example, litigants in the U.S. are required to produce relevant documents to the opposing party during an often lengthy pre-trial discovery process.  In China, litigants are not required to show their cards to each other.  When an American lawyer talks about providing the opposing party with documents that might hurt the Chinese client's case, the Chinese company tends to view the lawyer as naïve.  If, as too often occurs, the Chinese company second-guesses its American lawyer and fails to comply fully with the discovery process, it loses important credibility with the court. * * * Then, there are the complications when a Chinese litigant loses.  The American system offers far more options for forcing a defendant to pay.  Companies in China are notorious for shutting down their operations one day and then starting them a few days later under a new name to avoid paying a judgment.

In quoting this article, this Court does not imply that these problems are limited to Chinese companies.  Nonetheless, it appeared to this Court throughout the past three years that the difficulties Aviva and Manley's counsel were experiencing arose from Manley's profound lack of understanding of its responsibilities as a defendant in a U.S. lawsuit.

[2]     From June 18, 2009 to August 6, 2010, Manley was represented by Alan Anderson, Sharna Wahlgren, Michael Lafeber and Lindsey Saunders of Briggs & Morgan.  See Docket No. 31 (Notice of Appearance).  On August 6, 2010 Brooke Anthony and Norman Baer of Anthony Ostlund Baer & Louwagie P.A. entered their appearance on behalf of Manley, Fingerhut Direct Marketing, Inc., Menard, Inc., and Kmart Corp.  [Docket No. 194].  On December 12, 2011, Valle Makoff LLP associated with Anthony Ostlund Baer & Louwagie, P.A. as counsel for those defendants [Docket No. 504].  On February 9, 2010, Edward Laine and Samuel Hellfeld of Oppenheimer Wolff & Donnelly substituted for Anthony Ostlund Baer & Louwagie.  [Docket No. 516].  On April 30, 2012, Jonathan D. Wilson of Best & Flanagan, LLP substituted for Oppenheimer Wolff & Donnelly [Docket No. 578]. On April 14, 2012, Richard Grossman was admitted pro hac vice as counsel for Manley, Fingerhut, Menard and KMart [Docket No. 554]. On May 3, 2010, attorney Stephen Lobbin of the Eclipse Group in Irvine,

As a background to its decision, the Court describes below the various orders Manley had disregarded, not so much to recite chapter and verse Manley's wrongdoing, but rather to provide a context for this Court's recommendations that default judgment be entered in Aviva's favor on its federal and state false advertising claims, and that the costs and attorneys' fees previously ordered and still unpaid be reduced to judgment.

## A. **Manley's Document Production in China and Orders to Share Production Costs**

On August 25 and October 21, 2009, Aviva served document requests on defendant Manley Toys. Declaration of Ryan Sorge in Support of Motion to Compel Discovery of Manley Toys ("R. Sorge Decl."), Ex. B (First Set of Document Requests); Ex. D (Second Set of Document Requests) [Docket No. 159]. Manley responded, indicating that it would make non-privileged, responsive documents available for inspection at Manley's offices in China. Id., Ex. C (Manley's Objections and Responses to Plaintiff's First Set of Document Requests). Manley's counsel indicated that Manley located "60+" boxes of documents in China. Id., Ex. L (letter dated December 23, 2009 from M. Lafeber to R. Sorge). Aviva objected to the production taking place in China and moved for an order requiring that the production take place in the United States. Aviva's Memorandum of Law in Support of Motion to Compel Discovery, pp. 8-13, 26 [Docket No. 158]. Manley's counsel was unsympathetic, responding that having chosen to sue a Chinese company, Aviva would have to travel to China for the production. Manley Toy's Memorandum of Law in Opposition to Motion to Compel Discovery, pp. 2,

---

California was admitted pro hac vice, also as counsel for Manley, Fingerhut, Menard and KMart [Text Only Entry, May 3, 2012]. Oppenheimer, Wolff & Donnelly has sued Manley for failing to pay its legal fees, which at the time Oppenheimer filed its Complaint amounted to $118,535.34, exclusive of costs and interest. Complaint, ¶13 Civ. No. 12-2547(PJS/JSM) [Docket No. 1].

4-6 [Docket No. 167].   Manley confirmed that it had "more than sixty boxes" of responsive documents, but also indicated that based on Aviva's identification of an additional 35 products believed to reflect false advertising, it identified an additional 20 boxes of documents.  Id., p. 5.

On July 12, 2010, Manley estimated it would cost $145,000 to copy approximately 200,000 pages of documents, based on information from its vendor, Pitney Bowes.  Declaration of Keith Sorge in Support of Motion for Reconsideration ("K. Sorge Decl."), Ex. E (email from Manley's counsel to Aviva's counsel attaching estimate) [Docket No. 323-1].   Aviva began searching for a way to reduce what it considered an "extravagant" estimate, but Manley's counsel was uncooperative and told Aviva's counsel that "Manley was to gather the documents you requested and let you know what reproduction would cost, and you were to decide[.]   [T]ell us whether you want them reproduced or not.   Manley has done its part."   Id., Ex. J (email chain between K. Sorge and N. Baer dated August 9, 2010).   Aviva suspected that the documents related to its false advertising claims were actually housed in California, not in China, and tried to get to the bottom of that.   Id., Ex. H (correspondence from K. Sorge to N. Baer dated August 5, 2010).   Aviva ultimately agreed to production of Manley's documents in China, but only after Manley's counsel threatened to tell his client that the documents were no longer needed.   Id., Ex. J (email correspondence from N. Baer to K. Sorge, dated August 9, 2010).

Once the production began, the document handlers reported that the volume of documents was twice the original estimate.   Id., Ex. M (email from David Collier of Pitney Bowes to Brooke Anthony, Esq. dated Dec. 14, 2010).   The copying project

4

ultimately took three months, resulting in the production of approximately 250 boxes totaling in excess of 500,000 pages of documents and costing $567,569.38 to complete. Id., Ex. A (invoice from Pitney Bowes dated March 9, 2011); see also Affidavit of Norman Baer dated March 23, 2011 ("Baer Aff.") [Docket No. 334], Ex. 9 (spread sheet of Pitney Bowes invoices to Aviva); Exs. 15-20 (itemized invoices from Pitney Bowes from December 8, 2010 through February 25, 2011). Manley's counsel rationalized this disaster by stating that there was a "disconnect" between what a "box" means in the United States versus what a "box" means in China.[3] As it turned out, a "box" in China consists of a "big box" containing four "case boxes." Manley Memorandum of Law in Opposition to Motion for Reconsideration ("Manley Mem. in Opp."), p. 5 [Docket No. 341]; Declaration of Chan Siu Lun, ¶4 [Docket No. 336].

After the documents, many of which were in Chinese, were scanned and reviewed, Aviva quickly discovered that numerous documents were irrelevant. Plaintiff's Memorandum of Law in Support of its Motion for Reconsideration [Docket No. 322], pp. 8-9. Aviva's translator, Hong Zheng, indicated that he spent 31 hours reviewing the documents and that 90% of the Chinese-language documents did not relate to the 95 products at issue in the litigation. Declaration of Hong Zheng, ¶3 [Docket No. 330].

_____

[3] This was one of many points in this case where Manley's lawyers should have known that they needed to be more directly involved with their client's production. The "disconnect" was obviously between Manley and its counsel. While Manley continued to blame Aviva for the China production debacle, the fact of the matter is that not a single U.S. attorney representing Manley ever traveled to China to oversee Manley's production, in contrary to Fed. R. Civ. P. 26(g). That Rule imposes an affirmative duty on lawyers "to engage in discovery in a responsible manner that is consistent with the spirit and purpose of Rules 26 through 37…[and] obliges each attorney to stop and think about the legitimacy of a discovery…response." Fed. R. Civ. P. 26(g) Adv. Comm. Notes, 1983 amendments.

After the fact, a Manley employee submitted an affidavit stating that it was common practice in China to save paper that had been used on one side and "recycle" it by using the blank side. Declaration of Chan Siu Lun, ¶8. Therefore, many of the pages Aviva received were truly irrelevant. Manley contended that it fulfilled its discovery obligations because the "recycled" documents were produced as they were kept in the normal course of business. Manley Mem. in Opp., p. 15.

Manley's counsel admitted that no one from his law firm or counsel in China oversaw the selection of documents for responsiveness to Aviva's document requests. Transcript of April 13, 2011 Hearing ("April 13, 2011 Tr.") [Docket No. 374], pp. 41-42. In fact, no lawyer reviewed the 250 boxes of documents for responsiveness before the documents were delivered to Aviva. Id., pp. 44-45. Instead, Manley's counsel gave Manley the document requests and "made sure" that Manley understood them. Id., pp. 40. This Court was incredulous that Manley's counsel did not personally review and select responsive, non-privileged documents for production. Order, January 3, 2012, p. 18 [Docket No. 508]. Doing so would have avoided the surprise of the volume of documents and the recycling issue. Id. This Court noted that it could not:

> fathom why Manley did not convey this practice to its lawyers when it had the potential to exponentially increase the costs of production. . .had Manley's lawyers been on site, they not only could have insured responsive documents were being collected, they could have identified and rectified the issue and the terrible waste of time, money and resources devoted to copying irrelevant 'recycled" pages would have been avoided. Manley's post-hoc explanation to this Court of how to decipher the 'recycled' side of a document from the responsive side does not address a problem that never should have occurred in the first place.

Id., pp. 18-19. This Court further noted that Manley apparently had shipped documents from California to China as recently as August, 2010, at the same time that Aviva's counsel was expressing his concern that Manley might attempt to make document production more difficult by shipping its U.S. documents to China. Id., p. 18.

Based on Manley's role in the document production fiasco, this Court ordered Manley to pay 50% of the document production costs except to the extent that any of the copying invoices reflected the cost of shipping documents from California to China— Manley was to pay 100% of those costs. Id., p. 21.[4]

Manley objected to this Order and refused to make payment while its objections were pending. Manley Toys, Ltd's Objections to January 3, 2010 Order [Docket No. 510]. On February 28, 2012, Judge Ericksen affirmed the Order. [Docket No. 537].

Manley did not comply with the Court's Order by paying Aviva for its share the China production. Consequently, Aviva moved for sanctions in the form of a default judgment against Manley on all of its claims. Aviva's Memorandum in Support of Motion for Sanctions, p. 5. [Docket No. 562]. Manley, now represented by new counsel, had the temerity to contend that it had not violated the Court's January 3, 2012, Order because the Order did not provide a "date certain" by which Manley was to reimburse Aviva. Defendant Manley Toys, Ltd's Memorandum in Opposition to Aviva Sports, Inc.'s Motion for Sanctions, pp. 2-3 [Docket No. 580]. Manley believed that because it had "reached out" to Aviva's counsel and proposed a payment plan, which Aviva rejected, that it had complied with the Order. Id., p. 3. At oral argument on Aviva's sanctions motion, Manley's counsel stated that he thought that "within a week or two" Manley

---

[4] For its role in the fiasco, the Court ordered Aviva to pay the other 50% of the costs associated with the document production. Order, January 3, 2012, pp. 19-21.

would be able to "nail down" a payment schedule—a process never contemplated by the Court's Order. Order, May 9, 2012, p. 5 [Docket No. 594].

On May 9, 2012, this Court denied Aviva's motion for sanctions to the extent Aviva was seeking entry of default judgment, but ordered Manley to reimburse Aviva $238,254 on or before May 21, 2012, for the document production in China. Id., p. 6. Manley did not seek reconsideration of that Order, did not file objections to the Order, or seek any other form of relief. Instead, Manley again snubbed the Order and Aviva again moved for sanctions. [Docket No. 605]. In support of this motion, Aviva's counsel stated that late in the evening on May 21, 2012 (the day payment was due), he received an email from Manley's counsel forwarding a payment plan, in spite of this Court's previous rejection of a payment plan. Aviva's Memorandum of Law in Support of Motion for Sanctions for Manley Toys, Ltd.'s Violation of the Court's Order Sanctioning Manley ("Aviva Mem. in Support of Sanctions"), p. 2 [Docket No. 613]; Declaration of Keith Sorge in Support of Aviva's Motion for Sanctions, Ex. 1 (email from Manley's counsel Stephen Lobbin to Aviva's counsel Keith Sorge forwarding a payment plan) [Docket No. 614]. This payment plan consisted of an initial payment of $3,000[5] and subsequent monthly payments through February 28, 2013, ranging from $3000 to $67,254. Id. In defense of this absurd payment plan, Manley submitted a declaration from Raymond Choi, which brazenly stated that the payment plan was "the best alternative for both Manley and Aviva." Declaration of Raymond Choi [Docket No. 630]. Choi's declaration was unsupported by any factual evidence regarding Manley's supposed inability to pay the full amount due to Aviva.

---

[5] Manley had already forwarded a $3,000 payment to Aviva, which Aviva refused to accept. Order, June 15, 2012, p. 3. [Docket No. 638].

8

Aviva sought entry of default judgment "or at the very least" that Manley be ordered to pay its share of the costs within five business days and if it did not, that default judgment would be entered against Manley "on all [of] Aviva's claims." Further, if Manley did not pay, Aviva sought its attorney's fees and costs for having to bring the motion. Aviva Mem. in Support of Sanctions, pp. 4-5.

In its two-page responsive memorandum, Manley maintained it had "attempted in good faith" to comply with the Court's Order and suggested that its proposed payment plan was the "only reasonable way forward." Manley's Memorandum of Law in Opposition to Plaintiff's Motion for Sanctions, p. 2 [Docket No. 629].

On June 15, 2012, this Court again denied Aviva's motion for entry of default judgment, but ordered Manley to deliver a certified check for $238,254 to Aviva on or before the close of business on June 27, 2012. Order [Docket No. 638]. This Court stated that "the Court now hopes to persuade Manley that it is perilously close to this Court recommending the sanction of default judgment as punishment for its behavior. If Manley violates this Order, as it violated the Court's May 9, 2012, Order, the Court will recommend . . . that default judgment be entered on the issue of Manley's liability to Aviva on Aviva's Lanham Act claim." Id., p. 6. Further, if Manley failed to pay, the Court instructed Aviva to submit an affidavit setting forth its attorney's fees incurred in connection with its sanctions motions. Id.

On June 27, 2012, the day Manley's payment was due, Manley filed objections to this Order. [Docket No. 644]. Manley wrote: "alas, Manley is unable to complete this large of a payment-in-full today. By September 2012, Manley is almost certain that it

will make this payment to Aviva, in full and in one lump sum, as ordered." [6]  Objections

to June 15, 2012 Order of Magistrate Judge by Defendant Manley Toys, Ltd., p. 1

[Docket No. 644].  Manley also objected to that part of the Order regarding the issuance

of a Report and Recommendation recommending default judgment on Manley's liability

on Aviva's Lanham Act claim.  Manley contended that "the sanctioned conduct relates

not to liability for the alleged false advertising, but rather to discovery concerning Aviva's

Lanham Act <u>damages </u>claim—<u>i.e.</u> for disgorgement of Manley's alleged profits (available

only after liability is proven)." (emphasis in original).  <u>Id.</u>, p. 2.  Manley pointed to a

footnote in this Court's June 15, 2012, Order in which the Court wrote that "Manley's

conduct, which arose in connection with <u>discovery</u> on Aviva's Lanham Act claim,

warrants this sanction." <u>Id.</u>  (citing June 15, 2012, Order at n. 2) (emphasis added).

Manley argued that entering default judgment on the issue of liability, when Aviva

had not identified which year-to-year versions of the 63 Accused Products bore false

advertising, would result in liability for each of more than 700 different items of product

packaging used over 11 to 12 years, based on <u>prima</u> <u>facie</u> evidence of only a handful of

instances of allegedly false product advertisements identified by Aviva.  <u>Id.</u>, p. 3.[7]

Manley also objected because the underlying document production that formed

the basis of the sanction related to Aviva's efforts to obtain sales and cost information

on the 63 Accused Products, not on the threshold issue of liability.  <u>Id.</u>, p. 4.

Aviva took issue with Manley's "700 different product" argument as a basis for

objecting to entry of a default judgment.  Aviva's Opposition to Manley's Objections, p. 3

---

[6]     September 2012 has come and gone and "alas," Manley has not paid Aviva.

[7]     Manley offered no evidence in support of this statement.

[Docket No. 648].  According to Aviva, Manley "made up" the number of products and there was no evidence to support Manley's statement that 700 products were at issue. Id.  Aviva also contended that the China production did not relate solely to sales and cost information.  Id., pp. 3-4.  One document request related to Aviva's patent infringement claim, others related to the false advertising claims but were not limited to financial information.  Id., p. 4.

On July 30, 2012, Judge Ericksen affirmed this Court's June 15, 2012, Order [Docket No. 667].  Judge Ericksen noted that Manley's objections were devoted to a discussion of the issue of default when, in fact, no such Report and Recommendation had issued.  Order, p. 1.  Judge Ericksen further noted that Manley provided no support for its argument that it could not afford to pay its share of the production costs. Id., p. 2.

As directed by this Court's June 15, 2012, Order, Aviva submitted a declaration detailing its fees and costs incurred in connection with the sanctions motion it had brought in May.  Affidavit of Keith M. Sorge [Docket No. 655].  On September 7, 2012, this Court awarded Aviva $3,000 in attorneys' fees, payable in the form of a cashier's check to be delivered to the office of Aviva's counsel.  Order, September 7, 2012, p. 7 [Docket No. 696].  Manley was directed to notify Aviva at the time it delivered the check whether Manley intended to object to the Order.  Id.  If Manley intended to object, Aviva's counsel was directed to hold the check in his firm's trust account pending Judge Ericksen's ruling on the objections.  Id.

Manley disregarded this directive and filed objections to the Order without delivering a check to Aviva's counsel.  Objections to Orders of Magistrate Judge by

Defendant Manley Toys [Docket No. 702].[8]  Judge Ericksen affirmed the September 6

Order and noted that Manley was late in filing its objections.  Order, October 12, 2012,

p. 1 [Docket No. 710].

To date, Manley has not paid Aviva the $238,254 ordered to be paid to

compensate Aviva for Manley's share of the costs of the China document production,

nor has Manley paid the $3,000 in attorney's fees ordered on September 6, 2012 and

affirmed by Judge Ericksen on October 12, 2012.  See Letter to Magistrate Judge from

Aviva's Counsel dated September 24, 2012 [Docket No. 701].

## B.  Manley's Failure to Answer Interrogatory No. 8 and This Court's Award of Fees to Aviva

Interrogatory No. 8 from Aviva to Manley asked:

> State Manley's total annual sales (both in units and dollar
> revenue) of each Manley Toys identified products[9] from May
> 11, 2001 to the present; and describe in detail how gross
> and net profits are calculated, including without limitation,
> what costs are included in gross profits and net profits.  Also,
> identify the person or persons who is/are more
> knowledgeable about the subject matter of this interrogatory.

Declaration of R. Sorge, Ex. 13 (Manley's Answers and Objections to Aviva's Third Set

of Interrogatories) [Docket No. 367-3].  This Interrogatory was clearly intended to garner

information regarding Manley's profits and costs for Aviva's use in its damages

calculations.

---

[8]     Manley also objected to this Court's Order of September 6, 2012 [Docket No.
695], which required Manley to pay Aviva $121,184.40 in attorney's fees related to
Aviva's efforts to compel Manley to answer discovery.  The September 6, 2012, Order is
discussed in detail, infra.  Judge Ericksen's October 12, 2012, Order affirmed this
Court's September 6 Order as well.

[9]     The "identified products" are also referred to as the "Sixty-Three Accused
Products" or the "Sixty-Three Identified Products."

Manley answered the interrogatory as follows:

> Manley objects to Interrogatory No. 8 on the grounds that it is overly broad, unduly burdensome, and the subject of expert analysis and testimony. Manley further objects to this Interrogatory as vague and ambiguous in that it refers to the term "Manley Toys Identified Product." Subject to and without waiving these objections and the General Objections above and pursuant to Fed. R. Civ. P. 33(d), Manley directs Plaintiff to documents that Manley first made available to Plaintiff in October 2009. The persons most knowledgeable about the subject matter of this Interrogatory are Manley's internal and external bookkeepers and accountants.

Manley's then-counsel wrote to Aviva's counsel regarding Manley's answer to Interrogatory No. 8 and stated:

> Manley. . .will reiterate here that the documents Aviva needs to analyze gross and net profits include data from the shipping department (documents reflecting products shipped to customers), the finance department (documents related to receipts from customers and expenses paid by Manley), the production factories…and the sourcing agents. * * * At this point, Aviva and its expert witness are able to locate and identify the specific documents as readily as could Manley and its counsel. This specifically includes documents that are written in Chinese characters as Keith Sorge told me that you have people working with you who are fluent in the Chinese written language. Accordingly, Manley has met its obligation under Rule 33(d).

Id., Ex. 15 (letter dated March 14, 2011 from N. Baer to R. Sorge). Manley's counsel went on to list what he expressly described as "examples of documents that would have to be analyzed to answer the questions posed in Interrogatory No. 8." Id. (e.g. customer invoices related to sales to the defendants, documents related to the costs for packaging, shipping documents, customer invoices related to sales to retailers not a party to the litigation, cost reports and documents related to payments to Manley from its customers).

This Court found that the vague descriptions of financial documents Manley's then-counsel provided to Aviva's counsel did not constitute the specification of business records contemplated by Rule 33(d). Order, January 3, 2012, p. 40. [Docket No. 508]. This Court noted that "[i]nvocation of Rule 33(d) 'requires first that the information actually be obtainable from the documents.'" Id. (citing In re Sulphuric Acid Antitrust Litig., 231 F.R.D. 320, 325 (N.D. Ill. 2005)). Further,

> assuming a routine production of a large number of documents, Manley's answer to Interrogatory No. 8 and subsequent "direction" to Aviva regarding the location of the documents containing responsive information would be grossly inadequate. But this was not a 'routine' production. Adding to Aviva's burden is the fact that Manley produced an unknown number of "recycled" documents that do not relate to this case. Manley's shoddy document production, coupled with the complete lack of specificity regarding the documents to which Aviva should look for an answer to Interrogatory No. 8, has reduced discovery, which is intended to 'make a trial less a game of blind man's bluff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent,' to an exercise of looking for a needle in a haystack. United States v. Procter & Gamble Co., 356 U.S. 677, 682 (1958).

> Because Manley has invoked Rule 33(d) in its answer, this Court will require Manley to meet the requirements of that Rule. Within two weeks of the date of this Order, Manley must provide an amended answer to Interrogatory No. 8, signed under oath, which describe by Bates number, the documents Aviva should review to discern an answer to Interrogatory No. 8 with respect to the sixty-three Identified Products that are still at issue in this case.

> Because Manley has invoked Rule 33(d) in its answer, this Court will require Manley to meet the requirements of that Rule. Within two weeks of the date of this Order, Manley must provide an amended answer to Interrogatory No. 8, signed under oath, which describe by Bates number, the documents Aviva should review to discern an answer to Interrogatory No. 8 with respect to the sixty-three Identified Products that are still at issue in this case. If the responsive

documents have not been bate stamped, then Manley shall provide to Aviva a clear and detailed description of the responsive documents and the precise location of these documents within the production. Finally, Manley shall identify by name and position those persons "most knowledgeable about the subject matter of this Interrogatory." Manley's general reference to its "internal and external bookkeepers and accountants" does not suffice.

Armed with the information Manley provides, it will be Aviva's job to perform the calculations necessary to answer Interrogatory No. 8.

Order, January 3, 2012, p. 43 (emphasis added). This Court directed Manley to provide an amended answer to Interrogatory No. 8 on or before January 17, 2012.

On the day its amended answer was due, Manley served a partial supplemental answer on Aviva. Declaration of Keith Sorge in Support of Motion for Sanctions ("Sorge Decl."), Ex. 1 (Manley's Supplemental Answer to Interrogatory No. 8) [Docket No. 518]. This partial answer identified by Bates number 487,180 documents that Manley was in the process of reviewing, set forth the three-step process Manley was using to answer Interrogatory No. 8, and stated that it would provide an updated response by February 10, 2012—over three weeks past the deadline established by this Court. Id., p. 5.

Despite Manley's on-going protests that it did not maintain any sort of summary financial data, Aviva suspected that it did, and submitted documents that appeared to indicate that Manley did maintain this sort of information. Sorge Decl, Ex. 7 (email between Manley and Walmart reflecting detailed sales information by product); Ex. 8 (email between Manley and Walmart regarding inventory of Manley products), Ex. 9 (spreadsheet generated by Aquawood reflecting products shipped to Walmart, Kmart and Toys 'R Us showing sales of products by week), Ex. 10 (completely illegible

spreadsheet produced by Aquawood that appears to be financial in nature). Additionally, Aviva claimed that a "ten minute review" of the documents Manley identified as responsive showed that the documents were neither responsive nor relevant. Aviva's Mem., p. 7.

Concluding that Manley had disregarded the Court's Order regarding Manley's obligation to answer Interrogatory No. 8, Aviva moved for relief and once again sought a default judgment against Manley as a sanction for its conduct. Id., pp. 8-12; Docket No. 512 (Motion for Sanctions).

In its opposition to this motion, Manley incongruously argued that although its response was three weeks overdue, it had complied with the Court's Order regarding Interrogatory No. 8.[10]  Manley's Memorandum of Law in Opposition to Aviva's Motion for Sanctions ("Manley Mem."), pp. 1-2 [Docket No. 527].

Aviva's sanctions motion first came before the Court on February 28, 2012. [Docket No. 534].  At that hearing, Aviva's counsel stated that he had reviewed some of the documents provided by Manley, but could not discern an answer to Interrogatory No. 8.  Order, May 11, 2012, p. 10 [Docket No. 601].  Further, it did not appear that Manley had attempted to obtain documents from Aquawood, a business entity whose documents this Court previously determined were in Manley's "possession, custody or control" within the meaning of Fed. R. Civ. P. 34(a).  Order, Nov. 24, 2010 [Docket No. 250].  The Court continued the hearing because it was clear that neither Manley nor Aviva had reviewed all of the documents at issue.  Order, May 11, 2012, p. 11.  This

---

[10]     Manley neither complied with the January 3, 2012 Order nor sought any form of relief from the Order.

Court required Manley to contact Aquawood and Manley's Chinese manufacturers to determine if there were relevant, responsive documents in their possession. Id., p. 12.

At the continued hearing on March 14, 2012, Aviva's counsel stated that he had reviewed about half of the documents and estimated that only 15% of them related to the Accused Products. Id., p. 13. Aviva's counsel argued that it was to Manley's benefit that Aviva never discover the true amount of Manley's sales of the Accused Products. Id. Manley's counsel admitted that there were a "bulk" of receipts it had produced that did not relate to the Accused Products, but he insisted that this was an issue of foundation and admissibility at trial, not a discovery issue. Id. As to financial documents in the possession of Manley's Chinese manufacturers, Manley's counsel indicated that he had "reached out" to Manley and Manley would "reach out" to the manufacturers to see if they had documents reflecting sales and gross and net profit information. Id. The Court once more continued the hearing and required Aviva's counsel to explain more fully to Manley's counsel why he considered some of the documents not relevant. Id., p. 14. The Court also directed Manley to contact Aquawood to determine if there was a financial summary that would answer Interrogatory No. 8, or if there were other documents in Aquawood's possession that would answer the Interrogatory. Id.

At the re-convened hearing on April 2, 2012, Aviva's counsel appeared with a 1,300 page spreadsheet detailing the 44,000 pages of documents produced by Manley with an explanation as to why the documents were not responsive. Aviva's counsel stated that despite all of this effort, Aviva could still not glean an answer to Interrogatory No. 8. Aviva's counsel also challenged Manley's assertion that Aquawood could not

produce summary financial data.  Id., p. 15.  Aviva had tracked down a former Aquawood employee whose name had appeared at the bottom of a spreadsheet displaying what appeared to Aviva to be exactly the sort of summary financial information it had been seeking.  Id.  Aviva obtained a declaration from this individual, who indicated that he created and maintained spreadsheets of sales data from large nationwide chains (Walmart, Target, Toys 'R Us) for analysis and internal distribution.  Id.

Manley was highly critical of the length of Aviva's spreadsheet and insisted that Aviva somehow misunderstood the names of the products at issue (which would explain the number of documents Aviva considered not relevant or unresponsive).  Id.  Aviva's counsel responded that he was well aware of the product names.  Id., p. 16.

Under questioning from this Court, Aviva indicated that it had attempted to get sales information by subpoenaing eight of the largest retailers to get historical sales data on the Accused Products.  Aviva's damages expert did her work based on that information, which was limited to what the retailers paid Manley for the products.  Aviva lacked information that would support a calculation of Manley's overhead costs, which Aviva needed so its expert could opine with greater certainty regarding costs and profits.  Id.

This Court for the third time denied Aviva's request for the sanction of entry of default judgment, citing the very high bar to obtain such relief.  Id., p. 17 ("While the sanction of dismissal is 'drastic' and should therefore be used only in exceptional cases, a district court is not required to impose the least onerous sanction so long as it considers whether a lesser sanction is available or appropriate."  Brennan v. Qwest

Communications Intern., Inc._, Civ. No. 07-2024 (ADM/JSM), 2009 WL 1586721 at *7 (D.

Minn. June 4, 2009) (citations and quotations omitted)").  At the same time, this Court

was highly critical of Manley's unilateral decision to give itself a three-week extension of

time to comply with the Court's January 3, 2012, Order and then, when it did respond,

its response was "half-baked," and  contained an illegible signature not under oath.  Id.,

p. 20.

     This Court concluded:

> As of today, Aviva is no further ahead in ascertaining an
> answer to Interrogatory No. 8 than it was on January 3,
> 2012, when this Court issued its Order requiring Manley to
> supplement its answer to that interrogatory.  Aviva should
> not have had to painstakingly review 44,000 pages of
> documents and create a 1,300 page spreadsheet to explain
> to Manley, document by document, why the documents
> produced were not relevant.
>
>        \*\*\*
>
> [M]anley took the indefensible position that it was up to
> Manley, not Aviva, to "prove" overhead costs at trial.  This
> argument is not only absurd, it ignores this Court's order of
> January 3, 2012, which <u>required</u> Manley to amend its answer
> to Interrogatory No. 8 by providing a list of documents from
> which gross and net profits on the accused products could
> be calculated, including "what costs are included in gross
> profits and net profits."  Aviva was entitled to receive
> discovery of all components that make up Manley's profits
> on the Sixty-Three Accused Products so it can arrive at a
> reasonable calculation and cross-examine Manley or
> Manley's expert on its damages analysis.
>
> In summary, by the third hearing on Aviva's motion, the best
> Manley's counsel could do was assure the Court that the
> answer to Interrogatory No. 8 was somewhere in the 44,000
> pages of documents it had listed for Aviva.  It was obvious to
> this Court that Manley sent Aviva on a wild goose chase
> through the 44,000 pages and knew from the very beginning
> that Aviva would be unable to answer Interrogatory No. 8
> using those documents.  On this basis, this Court concludes
> that Manley engaged in a document dump rather than

properly producing records from which Aviva could answer Interrogatory No. 8, and that sanctions against Manley for its conduct are warranted.

Id., p. 23.  As was obvious, this Court was very concerned that Manley was obstructing Aviva's ability to calculate damages.

This Court awarded Aviva all of its attorneys' fees and costs associated with its motion for sanctions, including its costs for bringing the motion, attendance at the three hearings and creation of the 1,300 page spreadsheet.  Id., p. 24.

The Court ordered Manley to complete the following by June 1, 2012:

> 1.      Manley shall amend its answer to Interrogatory No. 8 to identify for each of the 63 Accused Products sold within the United States, from May 11, 2001 to the present on an annual basis by year:
> - Sales (number of units sold) of each product.
> - Revenues received from the sales of each product.
> - Costs associated with the sale of each product.
> - General overhead associated with the sale of all Sixty-Three Accused Products.
> - General costs (not covered in overhead) associated with the sale of all Sixty-Three Accused Products.
>
> This answer shall be confined to the actual named Sixty-Three Accused Products (and not comparable products or products that are the same as any of the Sixty-Three Accused Products that go by another name) and shall not include any of the Sixty-Three Accused Products sold overseas.
>
> Additionally, Manley shall amend its answer to Interrogatory No. 8 to identify for each of the 63 Accused Products sold within the United States, the documents (by Bates number) within the 44,000-pages listed in its updated supplemental answer served on February 10, 2012 that support its yearly calculations for:
>
> - Sales (number of units sold) of each product.
> - Revenues received from the sales of each product.
> - Costs associated with the sale of each product.

- General overhead associated with the sale of all Sixty-Three Accused Products.
- General costs (not covered in overhead) associated with the sale of all Sixty-Three Accused Products.

2.      If Manley has not already done so, it is ordered to preserve all financial reports and data regarding the Sixty-Three Accused products in the possession of Aquawood/Toyquest so that these materials are accessible in the future through trial.  In addition, on or before June 1, 2012, Manley shall produce to Aviva the yearly spreadsheets or reports of sales (or weekly or monthly reports for those years that yearly reports do not exist), broken down by retailer and product, for sales from May 11, 2001 to the present to Wal-Mart, Target, Toys R Us and Kmart, referenced in the Mathews Declaration.  Additionally, on or before June 1, 2012, if Manley cannot locate the spreadsheets or reports referenced in the Mathews Declaration, then it must describe in a letter to counsel for Aviva and this Court what steps Manley and Aquawood/Toyquest have taken to search for these spreadsheets or reports.

3.      On or before June 1, 2012, Manley is ordered to complete its search for responsive summary financial information from its Chinese manufacturers and produce those documents to Aviva.  If it is unable to locate such documents, then on or before June 1, 2012, Manley must describe in a letter to counsel for Aviva and this Court the steps it undertook to obtain these documents from these manufacturers.

4.      On or before June 1, 2012, Aviva shall serve and file an affidavit setting forth its reasonable attorney's fees and costs incurred in connection with the motion for sanctions (including preparation of the motion, attendance at the three hearings, its review of the 44,000 documents and preparation of the 1,300 page spreadsheet), and including the following information: the identity of each service provider; the amount of time each service provider expended on the motion and a description of each service provided; the hourly rate, level of experience and year of graduation for each service provider; and a description and amount for all expenses incurred.  On or before June 8, 2012, Manley shall serve and file any objections to the amounts requested by plaintiff.

Id., pp. 24-26.  The Court stated that it would issue an Order awarding fees and costs after receiving Aviva's submission and Manley's response.  Id., p. 26.

On May 30, 2012, Aviva submitted documentation of its fees of $121,184. [Docket No. 615].  Manley did not seek any relief from this Court's May 11, 2012, Order. Instead, nearly a month later, on June 8, 2012, Manley filed a document entitled "Manley's Objections to the Sanctions Amount Requested in Aviva's June 1, 2012 Sorge Affidavit; and Manley's Request for Additional Time."  [Docket No. 632].  Manley objected to Aviva's fee request as excessive (opining that Aviva's document review pace was too slow) and sought additional time to comply with this Court's May 11, 2012 Order.  Id., p. 2.  Manley's counsel claimed that although he had received the May 11, 2012, Order, he failed to read it because he was busy preparing for the Markman hearing before Judge Ericksen.  Id., p. 4.[11]

On September 6, 2012, this Court ordered Manley to pay $121,184.40 in fees and costs to Aviva pursuant to the Court's May 11, 2012, Order as a sanction for Manley's failure to answer Interrogatory No. 8.  Order, September 6, 2012 [Docket No. 695].  This Court reprimanded Manley for using its objections to Aviva's fee request as a springboard for asking for an extension of time to comply with the May 11, 2012 Order. Id., p. 4 ("One would think that in light of this Court's repeated warnings to Manley about its litigation tactics that Manley would not have made such an ill-advised request.  The Court will not consider Manley's improper request.").

_____

[11]    Counsel did not mention that the Order was also served on Manley's local counsel Jonathan D. Wilson, Esq. and co-counsel Richard Grossman, Esq. and David Shukan, Esq.  This Court rejects any suggestion that not a single one of these lawyers read this Court's May 11, 2012, Order.

The Order required Manley to deliver a check to Aviva's counsel on or before the close of business on September 21, 2012 whether or not it filed objections. Id., p. 12. Aviva's counsel was ordered to hold the check in trust if Manley filed objections to the Order. Id. Manley did not deliver the check and filed objections to this Order on September 24, 2012, four days after objections were due. [Docket No. 702]. In support, Manley submitted it had neither resisted providing discovery nor answering this interrogatory, had prepared and served a complete and detailed response to Interrogatory No. 8 on June 29, 2012, and in short, had been consistently cooperative. Id., p. 2. Additionally, Manley once again challenged the scope of Aviva's discovery, argued the fees sought by Aviva were excessive, and maintained that Manley's current financial situation did not permit it to pay the combined amount of $124,184.40 in lump sum. Id., pp. 2-3.

Aviva objected to Manley's untimely objections. Aviva's Response to Manley's Objections to Magistrate's September 6 and 7 Orders, pp. 1-2 [Docket No. 707]. Aviva also rejected Manley's attempt to persuade the Court that it had been more cooperative in discovery and had, in fact, answered Interrogatory No. 8. Id., pp. 4-5. To counter Manley's argument that it could not pay a lump sum award, Aviva's counsel indicated that Manley's counsel told him that Manley was working on product samples for trial at a cost of $150,000, casting doubt on Manley's plea of poverty as an excuse for not paying the attorneys' fees and China document production costs. Id., p. 5. Additionally, in an unrelated case involving Toys R Us, Aviva indicated that Manley had submitted a declaration that Toys R Us was withholding $7,000,000 in payment to Manley, which represented Manley sales to Toys R Us for one year. Id. According to Aviva, the logical

conclusion to be drawn from this fact is that Manley earns a substantial amount of money each year from product sales.  Id.  Aviva considered this to be evidence of Manley's financial health.  Id.

As previously noted (n. 8, supra.), Judge Ericksen affirmed this Court's Order and noted Manley's failure to timely file objections.  Order, October 12, 2012, p. 1. Judge Ericksen wrote:

> Despite the fact that the magistrate judge's orders were clear and explicit on the point, Manley has not—at least as far as the record reveals—delivered a single one of the required checks to Aviva.  It appears to the Court that the magistrate judge, in fact, exercised admirable restraint in the sanctions imposed in these two orders.

Id., pp. 1-2.

## C. Manley's Failure to Comply with the May 11, 2012 Order and Aviva's Motion for Sanctions [Docket No. 635]

Manley failed to provide Aviva with the information required pursuant to the May 11, 2012, Order and so on June 12, 2012, Aviva once again moved for sanctions against Manley [Docket No. 635].  Aviva sought entry of default judgment in Aviva's favor on its false advertising claims and its patent infringement claims.  Memorandum in Support of Motion for Sanction, p. 7 [Docket No. 640].  Further, Aviva strongly objected to Manley's effort to "sneak in" a request for an extension of time to comply with the Order through its objections to Aviva's fee statement.  Id., p. 6.  Aviva observed that to the extent Manley's counsel was asking for more time because he was new to the case, it was Aviva's opinion that "[i]t has appeared throughout this litigation that Manley switches counsel when it suits Manley's tactical objective of delaying the case.  This behavior should not be rewarded."  Id., p. 7.

In fact, Manley's counsel did argue that he was new to the case and that when he was retained he "did not become aware of the original discovery motion or the issue concerning Interrogatory No. 8, or that a decision from this Court would be forthcoming concerning Aviva's Interrogatory No. 8." Memorandum in Opposition to Aviva's Motion for Sanctions, p. 2 [Docket No. 643].[12]

Manley characterized Aviva's request for default judgment on all of its claims as "overreaching." Id., p. 4. Manley again pinned all of the blame for its failure to comply with the May 11, 2012, Order on Aviva ("[t]hese difficulties. . .could be alleviated if Aviva simply would identify the particular items of allegedly "false advertising" it intends to present at trial."). Id.

At the hearing on Aviva's motion on Monday, July 2, 2012, Aviva's counsel indicated that on the previous Friday evening at 9:00 p.m., he received an email from Manley's counsel with a document that purported to be Manley's supplemental answer to Interrogatory No. 8. Transcript of Hearing ("Tr.") p. 4 [Docket No. 705]. The document, which was provided to the Court at the hearing and subsequently filed [Docket No. 654] contained a list of the Accused Products; sales revenues received by Manley; costs of sales; associated general overhead; and associated general costs not included in overhead. Id. Aviva's counsel stated that he sent the document to his expert for her review, but his own brief analysis of the document was that Manley had no profit on any of their products. Tr., p. 5. Aviva's counsel also objected to the document in that Manley had not provided any evidence to support the numbers set

---

[12] This argument defies reason and common sense. All counsel of record are required to be on the Court's electronic filing system, CM-ECF. Upon filing of any pleading or order on CM-ECF, all counsel are instantaneously given notice of the pleading or order.

forth in the supplemental answer in violation of this Court's May 11, 2012, Order.  Id., p. 6.  That Order required Manley to identify by Bates number the documents that supported its answer.  See Order, May 11, 2012, pp. 24-25.

When this Court queried how the Aviva foresaw entry of judgment on damages in light of the lack of an adequate response to Interrogatory No. 8, Aviva's counsel indicated that Aviva would provide its damages expert with sales information it had obtained from retailers.  Tr., p. 8.  Aviva's counsel stated that Aviva "would prove up our case with what we have with regard to the question of damages. . . or profits."  Id.  The following colloquy between the Court and Aviva's counsel then took place:

> The Court:  [A]nd you're saying—presumably you're thinking that number may be higher than whatever number you could prove up from the numbers that you have obtained on your own, is that right?
>
> Mr. Sorge:  That's correct, Your Honor.
>
> The Court:  And you're saying that by asking for a default judgment, in essence, you would be willing to forgo what could be a potentially higher damage number in order to get the default judgment based on the number that you've developed?
>
> Mr. Sorge:  Yes, Your Honor.  I—I don't want to spend any more time on motions with regard to trying to get that number, to be perfectly frank.
>
> ***
>
> The Court:  So then if you were—if, again, I were to recommend what you're requesting or order it, what you're, in essence, saying is a default would be entered in the amount that you prove up without Manley being able to contest that amount?
>
> Mr. Sorge:  That's correct, Your Honor.

The Court: All right. Which would be the same as allowing you to prove up damages with a recommendation that they not be able to offer any contrary evidence or to contest it?

Mr. Sorge: Correct, Your Honor.

Id., p. 9-10.

Manley's counsel indicated that Manley was willing to stipulate to a damages amount:

Mr. Lobbin: So we want to be able—and I realize we're not in a position to be making demands, but we want to be in a position where we can at least continue talking about the issue of liabilities, even though as a result of all this discovery gone wrong, you know, at our fault, subjects us to some limitations on proofs regarding damages. As so that— that's the kind of general theme of, I hope, that you've got from the papers we've been filing.

\*\*\*

Nonetheless, my basic position to you today is that whatever sanctions do issue, because the underlying issues relate to damages, the sanction should be limited to proofs on damages, and so if Aviva can prove their liability on particular product packaging that is false, that's fine. That gets them to the question of damages. Then they've got to show sales. We've given them numbers that are substantially large that we think Mr. Sorge would walk in with our interrogatory response and be perfectly satisfied with the numbers that we're showing him on sales. And then, perhaps, you know, Manley, because of the transgressions and discovery and is limited to not being able to prove deductions from those sales or something to that effect that adequately accounts for the discovery issues that we've been discussing.

Id., pp. 11-12.

This Court then asked counsel whether Manley considered its answer to Interrogatory No. 8 complete. Id. Counsel responded that there was "more work done"

to provide more detail so as to be in "exacting compliance" with the Order, but "whether or not that results in any more information being turned over to Mr. Sorge, I can't promise that." Id., p. 15. When the Court noted that the Order required Manley to identify the documents on which it relied in making its calculation, counsel stated that was "one of the items that I'll be continuing to work on with the client to get." Id.

Manley's counsel then described what he characterized as a "little more fast and loose" bookkeeping system employed by Manley than would be employed in the U.S. and that the numbers reflected on the document he provided to Aviva's counsel were "sort of a little bit of empirical recounting of the past 12 years and summary information in that regard."[13] Id. When pressed by the Court as to whether counsel was confident that the information provided was accurate, Manley's counsel responded that he had confidence in the "people in Asia" from whom his client was receiving the information and that he was "taking people's word for it." Id., p. 20.

Manley's counsel agreed with this Court that it looked "a little odd" that the spreadsheet indicated that Manley had no profit on the products, but he explained that Manley took the view that "many costs, including this litigation, has added to the—you know, to the cost column, and they've taken the position that costs exceed revenue. . . those are the numbers that my client has provided me." Id., p. 16. Counsel argued that barring Manley from rebutting Aviva's damages calculations was more appropriate than ordering entry of default judgment on Manley's liability to Aviva. Id., p. 17.

---

[13]   Until proven otherwise through the production of a spreadsheet that ties the numbers Manley provided to corresponding financial documents, the Court assumes that "empirical recounting" means nothing more than a "guess."

At the conclusion of the hearing, Manley's counsel asked for more time to locate and identify documents that would support the numbers reflected on the spreadsheet.[14] Id., p. 23. Aviva's counsel emphasized that Aviva's point in bringing the motion for sanctions was not to compel any further answer to Interrogatory No.8; rather, Aviva was seeking sanctions for Manley's failure to comply with this Court's May 11, 2012, Order. Id., p. 23.

### D. Summary

To summarize the current state of affairs:

(1)     Manley has not paid Aviva $238,254 for its share of the China document production costs in violation of this Court's January 3, May 9 and June 15, 2012 Orders. This latter Order stated that if Manley failed to pay this sum, this Court would recommend to Judge Ericksen the entry of default judgment on Aviva's Lanham Act claims. Manley has never presented any acceptable evidence of its inability to pay the amount ordered and, in fact, Aviva has presented evidence of Manley's solvency. Judge Ericksen affirmed all three Orders. [Docket Nos. 537, 667].

(2)     Manley has not paid Aviva's attorneys' fees of $121,184 in violation of this Court's September 6, 2012 Order. In that Order, this Court indicated that if Manley failed to pay, the Court would consider "what additional sanctions are warranted for Manley's failure to comply. . . ." Order, p. 12. Judge Ericksen affirmed this Order on October 12, 2012. [Docket No. 710].

(3)     Manley has not paid Aviva's attorney's fees of $3,000 in violation of this Court's September 7, 2012, Order. In that Order, this Court indicated that if Manley

_____

[14]     As of September 24, 2012, Manley had not provided this information. See Letter to Magistrate Judge, September 24, 2012 [Docket No. 712]

failed to pay, the Court "shall then consider if additional sanctions are warranted for Manley's failure to comply with this Order." Order, p. 8. Judge Ericksen affirmed this Order on October 12, 2012 [Docket No. 710].

(4)     Manley has not answered Interrogatory No. 8 in violation of this Court's Orders of January 3 and May 11, 2012.

As a sanction for Manley's violation of the Court's May 11, 2012, Order, Aviva sought entry of default judgment on its patent infringement and false advertising claims.[15]

## II.     STANDARD OF REVIEW

Federal Rule of Civil Procedure 37(b)(2)(A)(vi) authorizes a court to render default judgment against a party who fails to obey an order to produce discovery. The purpose of sanctions under this rule is "not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent." <u>National Hockey League v. Metropolitan Hockey Club, Inc.</u>, 427 U.S. 639, 643 (1976) (per curiam). The     district

---

[15]     Aviva wrote to this Court on September 24, 2012, to inform the Court that it had not received payment for its attorneys' fees pursuant to this Court's September 6 and September 7, 2012, Orders. In that letter, Aviva's counsel stated:

> It is apparent that financial sanctions will not modify Manley's behavior of contempt of the Court. It is also apparent that default judgment will not modify Manley's behavior. Manley as a foreign corporation takes advantage of doing business in the United States, but refuses to comply with the laws of this country as a condition of doing business here. Aviva can only recommend that the Court enjoin Manley from importing any more products into the United States until it begins to comply with the Court's orders.

Letter to Magistrate Judge, p. 1 [Docket No. 701].

court has "a large measure of discretion in deciding what sanctions are appropriate for misconduct." Hutchins v. A. G. Edwards & Sons, Inc., 116 F.3d 1256, 1260 (8th Cir. 1997).

"Before a court may impose a dispositive sanction such as default judgment for a party's failure to comply with a discovery order, there must be '(1) an order compelling discovery; (2) a willful violation of that order; and (3) prejudice to the other party.'" Everyday Learning Corp. v. Larson, 242 F.3d 815, 817 (8th Cir. 2001) (quoting Keefer v. Provident Life & Accident Ins. Co., 238 F.3d 937, 940 (8th Cir. 2000)); see also Schoffstall v. Henderson, 223 F.3d 818, 823 (8th Cir. 2000) (citation omitted) (same); United States Bank Nat'l Ass'n v. Direct Equity Mortgage, LLC, Civ. No. 10-2367 (SRN/JJG), 2011 WL 2412951 at *1 (D. Minn. April 25, 2011) (same). However, the Court's discretion to issue Rule 37 sanctions "is bounded by the requirement of Rule 37(b)(2) that the sanction be 'just' and relate to the claim at issue in the order to provide discovery." Hairston v. Alert Safety Light Products, Inc., 307 F.3d 717, 719 (8th Cir. 2002) (quoting Avionic Co. v. General Dynamics Corp., 957 F.2d 555, 558 (8th Cir.1992)). "'[T]he district court's discretion narrows as the severity of the sanction or remedy it elects increases.'" Sentis Group, Inc., Coral Group, Inc. v. Shell Oil Co., 559 F.3d 888, 898 (8th Cir. 2009) (quoting Wegener v. Johnson, 527 F.3d 687, 692 (8th Cir. 2008)). The sanction of default, like the sanction of dismissal, "is among the harshest of sanctions, and 'there is a strong policy in favor of deciding a case on its merits, and against depriving a party of his day in court.'" Sentis, 559 F.3d at 898 (quoting Fox v. Studebaker-Worthington, Inc., 516 F.3d 1016, 1020 (8th Cir. 1975)). Nonetheless, default judgment is within the range of acceptable sanctions and the reviewing court will

not "substitute our own judgment for that of the district court even though we may have chosen a different sanction had we been standing in the shoes of the trial court." International Bhd. of Elec. Workers, Local Union No. 545 v. Hope Elec. Corp., 380 F.3d 1084, 1105-1106 (8th Cir. 2004).

When the facts show willfulness and bad faith, the district court need not investigate the propriety of a less extreme sanction. Hairston, 307 F.3d at 719; Hunt v. City of Minneapolis, Minn., 203 F.3d 524, 527 (8th Cir. 2000) ("This does not mean that the district court must find that the appellant acted in bad faith, but requires 'only that he acted intentionally as opposed to accidentally or involuntarily.'") (quoting Rodgers v. Curators of Univ. of Mo., 135 F.3d 1216, 1219 (8th Cir. 1998)).

In addition to the authority to grant sanctions pursuant to Rule 37 for discovery related violations, pursuant to its inherent powers, a court may "fashion an appropriate sanction for conduct which abuses the judicial process." Chambers v. NASCO, Inc., 501 U.S. 32, 44–45 (1991); see also Chrysler Corp. v. Carey, 186 F.3d 1016, 1022 (8th Cir. 1999) (affirming striking an answer and entry of default judgment and noting that "when a litigant's conduct abuses the judicial process. . . dismissal of a lawsuit [is] a remedy within the inherent power of the court."). "When rules alone do not provide courts with sufficient authority to protect their integrity and prevent abuses of the judicial process, the inherent power fills the gap." Shepherd v. Am. Broadcasting Cos., Inc., 62 F.3d 1469, 1474 (D.C. Cir. 1995). Such sanctions may be imposed against a litigant acting in "bad faith, vexatiously, wantonly, or for oppressive reasons." Chambers, 501 U.S. at 44-45. See also, Forsyth v. Hales, 255 F.3d 487, 490 (8th Cir. 2001) (noting that " 'default judgment is appropriate where the party against whom judgment is sought

has engaged in "willful violations of court rules, contumacious conduct, or intentional delays'. . . however, default judgment is not an appropriate sanction for a 'marginal failure to comply with time requirements.'") (quoting <u>Ackra Direct Mktg. Corp. v. Fingerhut Corp.</u>, 86 F.3d 852, 856 (8th Cir. 1996)).

## III.  DISCUSSION

### A. <u>Entry of Default Judgment</u>

Whether this Court applies its inherent powers to "fashion an appropriate sanction for conduct which abuses the judicial process," <u>Chambers</u>, 501 U.S. at 44-45, or its authority under Rule 37(b)(2)(A)(vi), the Court concludes that the sanction of default judgment should be imposed on Manley.  This Court's Orders have been explicit and detailed in their instructions to Manley regarding its obligation to answer Interrogatory No. 8, pay half of the costs of the China document production, and reimburse Aviva for its attorney's fees and costs associated with pursuing compliance with Manley's discovery obligations.  Manley has intentionally disobeyed every Order, has never offered any viable excuse for its willful conduct, and Aviva has been irreparably prejudiced in its ability to prepare for trial by the drain on its resources.

Manley very clearly believes that compliance with the Orders of this Court is optional and that the Court is powerless to compel it to comply.[16]  In this regard, Manley

---

[16]    Manley has not been helped in this regard by its attorneys, who have too often acted as passive conduits of Manley's indefensible positions and statements.  <u>See</u>, <u>e.g.</u> Declaration of Keith Sorge in Support of Aviva's Motion for Sanctions, Ex. 1 (email from Manley's counsel Stephen Lobbin to Aviva's counsel Keith Sorge forwarding a payment plan) [Docket No. 614].  Even worse, the lawyers have on occasion compounded Manley's misguided behavior with their own.  The Court is reflecting on Manley's counsel's decision to grant itself a three-week extension of time to comply with this Court's January 3, 2012 Order (<u>see</u> discussion, <u>supra</u>., pp. 15-16. ), counsels' failure to read the Court's May 11, 2012 Order (<u>see</u> discussion, <u>supra.</u>, n. 11), and their ill-

has generally relied on the traditionally high standard imposed on entry of default as a sanction as the linchpin to its argument against default. See Defendant Manley Toys Ltd.'s Memorandum of Law in Opposition to Aviva Sport, Inc.'s Motion for Sanctions, p. 12 (citing "strong" federal policy for trial on the merits, dismissal is justified only in "extreme" circumstances) [Docket No. 527]; Manley's Memorandum of Law in Opposition to Plaintiff's Motion for Sanctions, p. 1 ("for the same reasons [default] was inappropriate last month, it still is today.") [Docket No. 629].[17]  The Court suspects that Manley believes that this standard is so high that it renders it immune to entry of default judgment.  Manley is wrong.

Although the sanction of default judgment is harsh, courts in this jurisdiction have not hesitated to order such a sanction under appropriate circumstances.  See BBY Solutions, Inc. v. Karreman, Civ. No. 10-4726 (MJD/TNL), 2012 WL 5331846 at *2 (D. Minn. Oct. 9, 2012) (recommending entry of default judgment on plaintiff's claims of trademark infringement, unfair competition, false advertising, trademark dilution, trademark counterfeiting, cybersquatting, deceptive trade practices, common trademark infringement, unfair competition, tortious interference and unjust enrichment as a result of defendant's failure to comply with discovery orders and after warning defendants that "any future violation of any court order of applicable rule in this matter will result in an

---

advised and improper decision to seek an extension of time to comply with this Court's May 11, 2012 Order within the context of their opposition to Aviva's statement of fees (see discussion, supra., p. 22).

[17]  In its opposition to Aviva's most recent motion for sanctions, Manley concedes that a sanction, if one is imposed, should relate only to damages, not liability.  Manley's Memorandum of Law in Opposition to Plaintiff Aviva's Motion for Sanctions of Manley Toys, Ltd., p. 5 [Docket No. 643].  As discussed in more detail, infra, the Court believes Manley has made this concession because it benefits Manley.

entry of default and/or any other sanction, that the court deems appropriate."), Order Adopting Report and Recommendation, 2012 WL 1658941 (D. Minn. 2012); Valley Mining, LLC v. United States, Civ. No. 06-3667 (JRT/FLN), 2012 WL 694470 at *1 (D. Minn. Mar. 1, 2012) (overruling objections to Magistrate Judge's recommendation that default judgment be entered against defendants who had disregarded three prior orders regarding discovery); Country Inn & Suites by Carlson, Inc. v. Harkinson Corp., Civ. No. 10-740 (PJS/FLN), 2011 WL 7425059 at *(D. Minn. May 25, 2011) (recommending entry of default judgment against defendants who failed to respond to discovery and engaged in a pattern of sanctionable conduct), Order Adopting Report and Recommendation, 2011 WL 7425060 at *1 (D. Minn. June 9, 2011); Cabo Holdings, LLC v. Englehart, Civ. No. 07-3524 (PJS/RLE), 2008 WL 4831757 at *6-7 (D. Minn. Nov. 3, 2008) (order adopting Report and Recommendation that default judgment be entered against a defendant for its "direct disobedience" of Court's prior order and noting that "we are confronted with the direct disobedience of this Court's Order, which was without excuse, justification or defense.  If parties are free to ignore, or disregard, the lawful Orders of the court, the judicial process would be substantially undermined and faith in the Court's ability to pursue justice would be doubted."); Global Traffic Tech., LLC v. Tomar Elec., Inc., Civ. No. 05-765 (MJD/AJB), 2007 WL 4591297 at *7 (D. Minn. Dec. 27, 2007) (entering default judgment on defendant's liability for plaintiff's patent infringement claims, noting defendant' pattern and practice of violating the Court's orders, which hampered plaintiff's ability to prepare its case and noting that defendant's conduct "has undermined the integrity of this Court and our judicial system." Should the case continue, the Court had no faith that defendant would "finally begin to

comply with Court Orders or the Federal Rules of Civil Procedure.") (citing <u>Monsanto Co. v. Ralph</u>, 382 F.3d 1374 (D.C. Cir. 2004) (affirming district court's sanction of striking all of defendant's pleadings  and entering judgment on liability.  The sanction was within the court's discretion and justified based on defendant's willful violations of the district court's orders)).

The Court has considered whether there are any lesser sanctions it might impose against Manley and has concluded that there are none.  The measures the Court has taken to secure Manley's compliance with its Orders have proven utterly ineffective. Manley seems impervious to monetary sanctions.

The issue, therefore, is not whether to recommend the entry of default judgment against Manley.  The only remaining issue for this Court to determine is the scope of the judgment so that the punishment is appropriate to and commensurate with Manley's conduct.

It is true that the discovery order (and companion order for fees) that Manley has disregarded address Aviva's Interrogatory No. 8, which sought information related to damages.  But Manley's misconduct is not limited to just Interrogatory No. 8.  The Court is recommending entry of default judgment for the totality of Manley's behavior--its utter lack of compliance with the Court's directives to pay Aviva's attorney's fees and costs for its discovery conduct, to compensate Aviva for its half of the China document production costs, <u>and</u> to answer Interrogatory No. 8.

Further, the document requests that triggered this Court's Order to Manley to pay half of the China document production costs sought a broad range of documents, not merely documents related to Manley's overhead costs and profits on the Accused

Products.    See Declaration of R. Sorge in Support of Plaintiff's Motion to Compel Discovery, Ex. B, [Docket No. 159-1].  For example, Request Nos. 47 through 52 sought documents relating to how the products were advertised, whether products had been returned as a result of deceptive or misleading advertisements, and documents relating to the accuracy or truthfulness of the advertising.  Those documents go directly to the issue of Manley's liability for false advertising.[18]

This Court is also troubled by Manley's readiness to stipulate to Aviva's damages calculations on its false advertising claims in lieu of a finding on liability.  Manley has obstructed Aviva from obtaining a full picture of Manley's costs and profits, severely limiting Aviva's ability to calculate damages.  The Court strongly suspects that Manley believes that Aviva's damages calculations may not be accurate (i.e. these calculations understate Manley's profits on the Accused Products),[19] and believes that a stipulation to Aviva's damages will inure to the benefit of Manley.  Limiting sanctions to a stipulation on damages, but forcing Aviva to prove liability, would reward Manley for its conduct.

On the other hand, none of the Orders at issue related to Aviva's patent infringement case and the Court does not believe that it would be proper to recommend default judgment on those claims.

---

[18]    In this regard, the Court has considered and rejected the arguments Manley made to Judge Ericksen regarding the appropriate scope of default judgment.  See Objections to June 15, 2012 Order of Magistrate Judge, pp. 4-5.

[19]    Manley's Supplemental Answer to Interrogatory No. 8, which purported to show that Manley was not profiting from the sale of its products, was absurd and completely unsupported by any factual evidence.  It appeared to this Court to have been created out of whole cloth.

Therefore, this Court recommends that the District Court enter default judgment against Manley on its liability to Aviva on Aviva's Lanham Act and Minnesota Deceptive Trade Practices Act claims and award Aviva its damages relating to its Lanham Act claims. [20] To determine damages, Aviva shall submit to the District Court proof of its damages on its Lanham Act claims and Manley shall not be permitted to oppose this submission. Further, as both of these state and federal acts permit an award of attorney's fees and costs to the prevailing party in certain circumstances, Aviva shall be permitted to seek reasonable fees and costs incurred in pursuing its false advertising claims, which shall be considered and awarded at Judge Ericksen's discretion.[21]

Finally, to the extent that Manley may believe that entry of default judgment will relieve it from its monetary obligations to Aviva under this Court's January 3, June 15, September 6 and September 7, 2012, Orders, Manley is mistaken. Entry of default judgment should not excuse Manley from paying the amounts ordered to be paid

---

[20] The Minnesota Deceptive Trade Practices Act (MDTPA) provides only for injunctive relief and not damages. Ikechi v. Verizon Wireless, Inc., Civ. No. 10-4554 (JNE/SER), 2011 WL 2118797 at *4 (D. Minn. April 7, 2011), Order Adopting Report and Recommendation, 2011 WL 2118791 (D. Minn. May 25, 2011). Therefore, the scope of the default judgment on Manley's MDTPA claims must be limited to the available remedy.

[21] The MDTPA permits an award of attorney's fees to the prevailing party, "unless the court otherwise directs," in circumstances in which the court determines that the claimants have demonstrated that their cause of action benefits the public. Minn. Stat. § 325D.45, subd. 2; Collins v. Minnesota Sch. of Bus., 636 N.W.2d 816, 820 (Minn. Ct. App. 2001). To the extent the District Court grants default injunctive relief to Aviva on its MDTPA claim, the District Court has the discretion to determine if an award of fees is appropriate. The Lanham Act authorizes "reasonable attorney fees to the prevailing party" in "exceptional cases." 15 U.S.C. § 1117(a). "Courts have defined the characteristics of exceptional cases with adjectives suggesting egregious conduct by a party." 3M Co. v. Mohan, Civ. No. 09-1413 (ADM/FLN), 2011 WL 197219 at *4 (D. Minn. Jan. 19, 2011) (citation and quotation omitted). It is within Judge Ericksen's discretion to decide whether Aviva's case is "exceptional," warranting an award of attorney's fees.

pursuant to this Court's Orders of January 3 and June 15, 2012 ($238,254 in document production costs), September 6, 2012 ($121,184 in attorneys' fees) and September 7, 2012 ($3,000 in attorneys' fees). Accordingly, this Court recommends that the District Court reduce to judgment the sum of $362,438, in addition to all amounts it awards for damages, attorney's fees and costs associated with Aviva's Lanham and Minnesota Deceptive Trade Practices Act claims.

## IV.    **RECOMMENDATION**

For the reasons set forth above and based on all the files, records, and proceedings herein, IT IS RECOMMENDED that:

1. Aviva's Motion for Sanctions [Docket No. 635] be GRANTED in part and DENIED in Part.

2. Default judgment be entered in Aviva's favor on its Lanham Act and Minnesota Deceptive Trade Practices Act claims for an amount to be determined by the District Court upon proof of damages, and attorney's fees and costs at the District Court's discretion.

3. Judgment be entered in favor of Aviva and against Manley Toys, Ltd. in the amount of $362,438.00, in addition to all amounts it awards for damages, fees and costs associated with Aviva's claims under the Lanham Act and Minnesota Deceptive Trade Practices Act.

Dated: January 8, 2013                                  *Janie S. Mayeron*
                                                        JANIE S. MAYERON
                                                        United States Magistrate Judge

**NOTICE**

Under D. Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **January 22, 2013**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  A party may respond to the objecting party's brief within 14 days after service thereof.  All briefs filed under this Rule shall be limited to 3500 words.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.